[Sac. No. 1634.   In Bank.—March 24, 1909.]

## THE PEOPLE ex rel. G. W. CHAPMAN, Appellant, v. SACRAMENTO DRAINAGE DISTRICT et al., Respondents.

Reclamation of Swamp Lands—Power of Legislature—Special Tax.
The legislature has power, in a proper case, to impose a burden in
the nature of a tax upon specific lands, in proportion to the esti-
mated special benefits which those lands will receive from work done,
if the character of the work is such that its performance confers
some general benefit on the public as well as a private benefit on the
land.   Such power extends to the reclamation of all swamp and over-
flowed lands in the state, whether the title thereto was acquired
under the Arkansas Act or was derived from a Spanish or Mexican
grant.

Id.—Sacramento Drainage District—Act of 1905 Is Constitutional.
—The act of the legislature of 1905, entitled "An act to create a
drainage district to be called 'Sacramento Drainage District,' to pro-
mote drainage therein; to provide for the election and appointment
of officers of said drainage district; defining the powers, duties
and compensations of such officers and providing for the creation,
division and management of reclamation, swamp land, levee, drain-
age and protection districts within said Sacramento Drainage Dis-
trict, and providing for levying and collecting assessments upon the
lands within said drainage district," is not in conflict to section 11
of article I, nor to section 25 of article IV, nor to section 6 of
article XI of the state constitution.

Id.—District Not a Municipal Corporation.—The Sacramento Drain-
age District organized by that act, if a corporation at all, is not a
corporation organized for municipal purposes, within the contem-
plation of section 6 of article XI of the constitution.

Id.—Special Legislation—Constitutional Law.—The act, while a
special act, is not obnoxious to the other sections of the constitution
above referred to, as the subject-matter of the act necessitated a

special law. It requires a clear showing upon the face of a law itself that a special act is not required, before a court would interfere with the determination of the legislature upon such subject.

ID.—DUTY OF STATE TO IMPROVE NAVIGABLE RIVERS—ASSESSMENT FOR SPECIAL BENEFITS.—The act is not unconstitutional, as being a covert attempt upon the part of the state, under the guise of assessment for special benefit, to impose upon the landowners the cost of work, for which alone the sovereign state should pay, of improving the channels of its navigable rivers. While the expense of such work is usually met by the state, it is not the legal duty of the state in every case so to do.

ID.—TITLE OF ACT—SUBJECT-MATTER—BENEFITS TO LAND.—The act is not in conflict with section 24 of article IV of the constitution, in embracing more than one subject-matter and in not embracing in its title the principal subject-matter. The subject-matter of the benefits which might accrue to the land in the event of the rectification and deepening of the river channels is subordinate, germane to, and within the general purposes expressed in the title of the act, and did not require express mention in the title.

ID.—DUE PROCESS OF LAW—TRIBUNAL TO DETERMINE BENEFITS.—The provisions of the act do not operate to take the landowner's property without due process of law, either in denying him a hearing upon the question of the inclusion or exclusion of his land, or by the creation of an illegal and unconstitutional tribunal to pass upon and determine the question of the benefits which his land may receive.

ID.—BOUNDARIES OF DISTRICT—LEGISLATIVE DETERMINATION—CONCLUSIVENESS AS TO BENEFITS.—The legislature has the power to fix the boundaries of a reclamation district, and when it has done so, and its determination may be deemed to depend upon a question of fact, it is conclusively presumed that it took evidence in its determination and its decision is not subject to review by the courts. The legislature, when it fixes the district itself, is supposed to have made proper inquiry, and to have finally and conclusively determined the fact of the benefits to the land included in the district, and the owner has no constitutional right to any other or further hearing upon that question. The right which he thereafter has is to a hearing upon the question of the amount of the tax which he is to pay.

ID.—BOARD OF COMMISSIONERS—JUDICIAL FUNCTIONS.—The fact that the board of drainage commissioners created by the act, in equalizing assessments and correcting errors therein, act judicially, does not constitute them a court, or confer upon them judicial powers, in violation of sections 1 and 5 of article VI of the constitution.

ID.—MEMBERS OF BOARD MAY BE LANDOWNERS.—The members of the board as constituted by the act are not disqualified by interest to act as a tribunal to hear objections to assessments by reason of the fact that they are landowners within the district.

ID.—ACT DOES NOT IMPOSE DOUBLE TAXATION.—The act is not subject to the objection that it imposes a double tax upon the land. The special assessment for benefits is upon the theory that, to the amount of such assessment, the land is directly benefited. Such general tax as the land may pay to the state stands upon an entirely different foundation.

ID.—ACT DOES NOT IMPAIR OBLIGATION OF CONTRACTS.—The act in terms does not attempt to impair the obligation of existing contracts. The state has the right to vary its plans for the reclamation of the lands within the drainage district, and in so doing to create new or different agents and mandatories.

ID.—QUALIFICATIONS OF VOTERS—RESTRICTION TO LANDOWNERS.—The provision of the act restricting the right to vote for drainage commissioners to the owners of real property within the district, is not violative of section 14 of article I of the constitution, prohibiting the requirement of a property qualification for a voter.

APPEAL from a judgment of the Superior Court of Sacramento County. G. W. Nicol, Judge presiding.

The facts are stated in the opinion of the court.

U. S. Webb, Attorney-General, Arthur C. Huston, Hudson Grant, and C. E. McLaughlin, for Appellant.

Devlin & Devlin, and George & Hinsdale, for Respondents.

HENSHAW, J.—This is a proceeding in *quo warranto*, brought under section 803 of the Code of Civil Procedure. That section authorizes the attorney-general in the name of the people of the state, upon his own initiative, or upon that of a private person, to prosecute an action against any person "who usurps, intrudes into, or unlawfully holds or exercises any public office, civil or military, or any franchise within this state."

In 1905 the legislature passed an act entitled: "An act to create a drainage district to be called 'Sacramento Drainage District,' to promote drainage therein; to provide for the election and appointment of officers of said drainage district; defining the powers, duties and compensations of such officers and providing for the creation, division and management of reclamation, swamp land, levee, drainage and protection districts within said Sacramento Drainage District, and providing for levying and collecting assessments upon the lands within said drainage district." The provisions of this act, so far as

material to the present consideration, are as follows: The legislature created a drainage district, defining the boundaries thereof and the lands embraced therein. These lands are situated in the counties of Sacramento, San Joaquin, Solano, Yolo, Colusa, Sutter, Yuba, Placer, Glenn, and Butte, and this territory embraces, in part, lands already organized into reclamation, drainage, swamp land, or levee districts. The act provides for the selection of drainage commissioners, nine in number, apportioned amongst the above-named counties. These commissioners are to be elected by the owners of real property within the district, each owner being entitled to cast one vote for each dollar's worth of property. Provisions are made for the conduct of these elections and the filling of vacancies which may arise in the board. With other powers, the board of drainage commissioners is given supervisory control over the proposed work of reclamation districts within the limits of the drainage district, is empowered "to approve or disapprove any plan of reclamation in any reclamation district, to compel the construction and maintenance of necessary reclamation works in reclamation districts, to appoint trustees of reclamation districts in case of vacancies, and in general, to do all other acts and things necessary or requisite for the full exercise of their powers, or necessary for the promotion of the reclamation of lands within the drainage district." In this connection power is expressly conferred "to supervise and control the formation, consolidation or division of reclamation districts within said drainage district." When necessary, the board may levy an assessment upon the lands within the district, and in the levying of such assessment the board is required to make an estimate of the sum necessary. It is then to appoint three disinterested persons as assessors. These assessors are to assess upon the land within the drainage district the sum so estimated by the board of drainage commissioners, and shall "apportion the same according to the benefits that will accrue to each tract of land in said district respectively by reason of the expenditure of said sums of money." The assessors are required to make their lists, describing the tracts of land assessed, with the names of the owners, if known, and the amount assessed against each tract. These lists are to be filed with the secretary of the board of drainage commissioners, who in turn shall forward to the

county treasurer of each county the assessment-list for each county, which shall be open to inspection by the public. Thereupon the board of drainage commissioners is to appoint a time and place for each county, when and where it will meet for the purpose of hearing objections to the assessments. Notice is to be given by publication for two weeks in a newspaper in the county published nearest to the district. Any person believing himself to be injured by the assessment may present his grounds of objection thereto, and at its meeting the board of drainage commissioners shall hear the evidence offered touching the correctness or equity of such assessment, "and may modify or amend the same, and the decision of said board of drainage commissioners shall be final, and thereafter said assessment-list shall be conclusive evidence that the said assessment has been apportioned according to the benefits that will accrue to each tract of land in said district, and such assessment shall constitute a lien upon the lands so assessed." After thus equalizing the assessment, the moneys called for thereunder are to be paid into the county treasury in installments in such amounts and at such times as the board shall by order direct, sixty days being allowed for payment after such order. The board of drainage commissioners is authorized to begin suit in the superior court of the county where the land is situated for the collection of delinquent and unpaid assessments, and for the foreclosure of the lien upon the property in enforcement of such collection.

A board known as the "Board of River Control" is also created. This board consists of two members, appointed by the governor of the state, one of whom is to be the president of the board of drainage commissioners, and the other some competent civil engineer. The duties of the board of river control are, for the most part, advisory. This board has supervision of all levees and canals intended to do duty in disposing of flood waters. It is empowered to acquire from private owners or from reclamation, swamp land, or other districts, such rights of way, easements, and property as may be necessary for its purposes. It is the duty of the board to advise and consult with such board or officers as may be appointed by the government of the United States, to devise and construct works for the improvement and rectification of the channels of the Sacramento and San Joaquin rivers and their

tributaries. It is its duty also to examine all plans and specifications which may be prepared or adopted for the construction of the works for the controlling of flood waters or improvement of the channels of the rivers and their tributaries, and to submit a copy of all such plans and specifications to the state board of examiners for the latter's investigation and consideration. When called upon, the board is to confer and advise with the state board of examiners upon the matter of these plans.

Within six months after the organization of the board of drainage commissioners, this board is to appoint a committee of three persons to act in conjunction with a similar committee appointed by the governor of the state of California to determine the proportion to be borne by said district and state respectively, of the cost of constructing and completing either the work recommended in the report of certain named engineers or the work called for by such other plan as shall be approved by the state board of examiners. When this cost has been apportioned, and the apportionment approved by the board of drainage commissioners, the latter shall appoint three assessors—disinterested persons—who, in the manner above outlined, shall proceed to assess upon the lands within the drainage district the sum apportioned against said district as its proportion of the cost of the work. All the proceedings for the levying, equalizing, and collecting of such assessment are prescribed as above set forth. It is provided, however, that no part of this assessment shall be called in or collected "until the state of California and the government of the United States, or one of them, shall have made an appropriation, or other legal provision, for the payment of the balance of the sum to be expended jointly with said district in performing the work according to the plans recommended. . . . In case the payment of said sum by the state of California, or the government of the United States, shall not be provided for within five years from the time said assessment shall have been levied, said assessments upon said lands shall become void, and the lien thereof upon the said lands shall expire." Provisions then follow for the formation of new reclamation districts within the area of the drainage district, under the supervision and control of the drainage commissioners, and for the consolidation of existing districts, under like supervision and control.

And, finally it is provided that until legal provision has been made by the state of California or the government of the United States, for the payment of such proportion of the cost of the work as may be charged to them, or either of them, under the adopted plan, the powers of the board of drainage commissioners conferred by the act are suspended, excepting that the board may cause to be levied and collected an assessment, not exceeding the sum of fifty thousand dollars, to be used in the furtherance of the general plan, and the powers of all boards of supervisors, trustees of reclamation, and other districts are continued in force until the general powers of the drainage commissioners shall have become fully effective.

The purpose and scope of the act are clearly discernible from a reading of it. The causes which led to its enactment form a part of the history of the state. Riparian, or in proximity, to the great San Joaquin and Sacramento rivers are vast tracts of low-lying lands, some strictly swamp lands, others subject to overflow at the usual stages of high water, others liable to inundation in times of extraordinary freshet, but all requiring the expenditure of money in the construction of levees, drainage ditches, and pumping plants for their reclamation and subjection to economic use. Some of these lands, and indeed some embraced within the drainage district thus created, were acquired by the state of California from the United States under the Arkansas Act, and in turn were sold into private ownership by the state. Others came into the hands of private owners by mesne conveyances, the original source of such titles being the government of Spain or Mexico, whose grants were confirmed by the United States. Aside from any duty which it may be conceived that the state of California owed to the United States because of the trust upon which it took the lands under the Arkansas Act, it was clearly desirable and beneficial to the state that all of these lands should be reclaimed for purposes of husbandry. This improvement would add great wealth to the state, and this improvement therefore would result in a public benefit. Upon the other hand, the specific lands thus reclaimed would be especially benefited by their enhanced and assured productiveness, and it was proper that such lands should bear the cost of the work of reclamation proportioned to the benefits

which they would thus receive. Such being the condition, levee districts, drainage districts, and reclamation districts came into existence, some by special legislative enactment, others under general and permissive laws. One and all these laws had in view the same end—the reclamation of the lands from the excess of waters which poured upon them, and the opening of them to uses otherwise impossible, with the increase in settlement, population, and general prosperity which inevitably would follow. In time, two impending difficulties came to be perceived: 1. That, because of the great number of such small districts, each operated independently and under no general plan for the good of all, much money and labor were wasted. Since there was no common and harmonious plan of reclamation, one district frequently worked in antagonism to another; the operations or the neglect of one district might tend to imperil the existence of another; while the extravagant use of money, made necessary because of the lack of concerted action and because each district was obliged to fight not alone the common enemy—the water—but perhaps equally an adjoining district, put burdens upon many of the districts which soon became intolerable, with the result that the districts themselves were sometimes abandoned, and their works fell into disrepair and disuse; and 2. Owing to the sediment and debris settling upon the bottoms of these rivers, the plane of their water levels was heightened, to the increased endangerment of the adjacent lands. In times of flood it became more and more difficult for these rivers to carry and discharge their waters through the natural channels, and the condition soon became a matter of state and national concern. The government of the United States primarily, and of the state secondarily, having in them vested the exclusive management and control of navigable waters, were confronted with the corresponding duty of preserving the two great inland water highways of the state. The accomplishment of this called for the deepening and the rectification of the river channels, matters exclusively of federal or state cognizance. In turn, however, such deepening and rectification, by enabling the rivers successfully to carry and dispose of their flood waters, would greatly facilitate the labor of reclamation imposed upon the owners of the adjacent lands. Thus, in outline, is presented the situation with which the state was confronted.

Itself, or the federal government, or both, would take charge of the work of widening, deepening, and straightening the river channels. Itself, or the federal government, or both, would provide funds for the payment of this work. Upon the other hand, the lands adjacent to the rivers would be greatly and directly benefited by this work, and should be subject to special assessment to pay for the special benefit thus received. Such being the situation it was deemed expedient by the state to form one large district, to the end that the commissioners of such district might by exercising supervisorial control over the smaller districts, and by adopting one general plan of reclamation, economize in expenditures, save the extravagant waste of moneys which had been a part of their past history, and by a general assessment over a large area materially lessen, perhaps, the burden which the landowners might otherwise be called upon to bear. These were the obvious reasons actuating the legislature in formulating the scheme in the act under consideration. It is to be considered whether the expression which they gave to their plan does violence to the constitution.

1. The question of the power of the legislature, in a proper case, to impose a burden in the nature of a tax upon specific lands, in proportion to the estimated special benefits which those lands will receive from the work done, may not be doubted. The limitation upon its power,—it is well settled,— is this, that to sustain such a law it must appear that the character of the work is such that its performance confers some general benefit on the public as well as a private benefit on the landowner. And that the improvements here contemplated are of such character, has long been definitely settled. So complete is the control of the state over swamp and overflowed lands, that its power to provide for reclamation of them is not limited to those lands the title to which was acquired under the Arkansas Act, but it exists as to all swamp and overflowed lands in the state, even if the title was derived from a Spanish or Mexican grant. (*Hagar* v. *Yolo Co.*, 47 Cal. 222; *Hagar* v. *Reclamation Dist.*, 111 U. S. 701, [4 Sup. Ct. 663]; *Fallbrook Irr. Dist.* v. *Bradley*, 164 U. S. 112, 163, [17 Sup. Ct. 56].)

2. The act does no violence to section 11 of article I, nor to section 25 of article IV, nor to section 6 of article XI of the

constitution of the state. That the district here organized, if it be considered a corporation at all, is not a corporation organized for municipal purposes within the contemplation of section 6 of article XI of the constitution, must be taken as well settled. (*People* v. *Reclamation District No. 551,* 117 Cal 114, [48 Pac. 1016] ; *People* v. *Levee District No. 6,* 131 Cal. 30, [63 Pac. 676] ; *Reclamation District* v. *County of Sacramento,* 134 Cal. 477, [66 Pac. 668].) It is unnecessary to repeat the reasons set forth in the decisions in those cases by which the conclusion there reached was expressed, to the effect that such districts are, in strictness, not corporations at all, but rather governmental agencies to carry out a specific purpose—the agency ceasing with the accomplishment of the purpose. But, additionally, it may be said that the likeness of these agencies to corporations is superficial, and that the similitude—for it is no more than this—ceases if consideration be paid to the fact that the state could accomplish this very work without organizing a district as such at all, and without giving the landowners within the district any voice in the selection of the managers or trustees. Thus it would be perfectly legal and competent for the legislature, delimiting a tract of land, itself to appoint a commissioner or commissioners to perform all of the functions which, under the existing schemes, are performed by the trustees and the assessors. In fact, historically, such was the original method adopted when, in the reign of Henry VIII, the first statute was passed providing for the construction of sewers, drains, and other improvements designed to reclaim swamp lands (23 Hen. VIII, chap. 5, par. 1 [1531]), and such is the method still adopted in many of the states of this nation. It is in accord with the progressive spirit of our government to give to the people, or any part of them, the largest possible control in matters peculiarly affecting them and their interests. It is a concession to this spirit, and not the compulsion of the law, which prompts the legislature to give the landowners so large a voice in the management of these affairs.

Nor, while a special act, is the law obnoxious to the other sections of the constitution above cited. The considerations dictating the necessities of a special law are plain as above set forth. It would require a clear showing upon the face of the law itself that a special act was not required, before a

court would interfere with the determination of a co-ordinate branch of the government upon this subject, and, generally, as is said in *People* v. *McFadden,* 81 Cal. 489, [15 Am. St. Rep. 66, 22 Pac. 851], the determination of such a matter "depends upon questions of fact which this court has no means of investigating, and upon the solution of which it would not attempt to substitute its judgment in place of that of the legislature."

3. It is argued with much earnestness that no such law as this has heretofore ever been found upon the statute books; that it should be condemned as unconstitutional, as being a covert attempt upon the part of the state, under the guise of assessment for special benefit, to force upon the unfortunate landowners the cost of the work for which alone the sovereign state should pay—the work of the improving of the channels of its navigable rivers. The fact that legislation is novel, demands of a court that it be scrutinized with exceptional care, but it does not dictate its condemnation. It is true that the protection and development of its harbors and waterways (subject always to the paramount right of the United States) are matters of state consideration and control. It is true also that usually, since the work is for the general benefit of all of the people, the expense is met by the state itself. But it does not herefrom follow that in every case it is the legal duty of the state so to bear the burden. Whenever the legislature has spoken, the question before the court is not the propriety of its legislation, but its power to legislate. The harbor of San Francisco is benefited for purposes of navigation and commerce by a sea-wall along the water front. At the same time it will not be questioned that the lands held in private ownership in close proximity to such sea-wall, and which without such sea-wall would be inundated "water lots," are especially benefited by this harbor work. The state, if it elects, may pay all the cost. But it will not be denied that the state has the power to impose upon the adjacent lands specially benefited by the work an assessment in proportion to such benefits, to defray a part of the cost. Or, again, in the matter of governmental power and control, the water highways of the state do not differ from the land highways. The power of the state to exact payment for the improvement of its streets from the owners of land adjacent thereto, in proportion to the

benefits which their lands receive, is unquestionable and un-unquestioned. Legislation, which in like manner exacts similar contribution from lands adjacent to the inland waterways, for like considerations stands upon the same ground, and for the same reasons may not be successfully assailed. The two classes of legislation are congeneric and have their origin and draw their inspiration from the same power and source—the governmental power of the state to tax, and to specially tax for a public purpose, where the work to be performed will confer a special benefit upon the property of the particular landowner, as distinguished from the general good which it will work to all.

4. It is urged the act does violence to section 24 of article IV of the constitution, in embracing more than one subject-matter and in not embracing in its title the principal subject-matter. The penalty which the constitution imposes upon such legislation is to make void the matter which is not expressed in the title. This inquiry being in *quo warranto,* and the legitimate subject-matter of investigation being the usurpation by defendants into an office or franchise, it may be that the act contains provisions not germane to nor fairly embraced within the subject-matter of the title. But only in the event that such an unexpressed provision or provisions may be essential to the existence of the law itself, does it become material to this consideration. If not fatal to the life of the act, such provisions fall, without destruction of the act itself, and their consideration and discussion would have no proper place upon this appeal. The title of the act has been quoted above. It is contended that this title masks, conceals, indeed omits reference to the principal purpose of the act, which is the improvement of the river channels, and the throwing of the burden of the cost of such improvement upon the private landowner. It may be conceded that the title of the act contains no suggestion that in the promotion of drainage and reclamation of the lands within the district, the improvement of the river channels is contemplated. But the title is broad enough in its language to disclose that the general purpose of the act is to provide a scheme for the betterment of the lands lying within the described area. Such aspects of the rectification and improvement of the river channels as are set forth in the act, if falling within and germane to the general pur-

pose announced by the title, did not require expression in that title. The two great purposes of the act, as above suggested, are, first, to bring into harmony under one general board of control the plans and work of existing districts and of the other lands not in them embraced. All this is quite independent of the matter of the improvement of the river channel. The second purpose is contingent upon the action of the state or federal government. It contemplates—still for the general purpose of the promotion of the reclamation of the lands—that it shall be determined what benefit those lands will receive, if and when the government shall undertake this work. It was not the purpose of the constitutional provision here invoked to hamper legislation, but to check and prevent deceptive legislation, (Cooley on Constitutional Limitations, p. 175; *Ex parte Lidell,* 93 Cal. 638, [29 Pac. 251]; *Law* v. *San Francisco,* 144 Cal. 388, [77 Pac. 1014]; *Beach* v. *Von Detten,* 139 Cal. 462, [73 Pac. 187]; *People* v. *Linda Vista Irr. Dist.,* 128 Cal. 477, [61 Pac. 86]), and we hold that the subject-matter of the benefits which might accrue to the land in the event of the rectification and deepening of the river channels was subordinate, germane to, and within the general purpose of the title, and did not call for express mention in that title.

The other considerations presented by appellant as showing that the body of the act contains a multiplicity of subjects foreign to its title, may be disposed of collectively. From what has been said, it appears that the creation of the board of river control is not only within the purpose, but within the very title of the act. The other objections go to the powers conferred upon the officers and it may be seen that these powers are in legitimate aid of the general purpose of the act. If it should hereafter be found, that as to some specific matter excessive power had been conferred, it would be so decreed, but the decision would not tend to destroy the law as a whole. Upon the general subject-matter of the management and control over the existing districts, vested in the board of commissioners of the district here created, it may be suggested that it was within the unquestioned power of the legislature, with due regard to vested rights, to have put out of existence all of these districts, and, having done so, to have created a board of commissioners to manage future works of reclamation. That it has done less than this, by conferring upon such

a board supervisorial control of these districts, while continuing their existence, is but an exercise by the legislature of less than its plenary power.

5. It is argued that the act in question works a taking of the landowner's property without due process of law. Herein it is insisted (a) that the landowner was denied a hearing to which he was entitled upon the question of the inclusion or exclusion of his land; (b) that an illegal and unconstitutional tribunal was created to pass upon and determine the question of the benefits which his land, so improperly included, may receive, in violation of sections 1 and 5 of article VI of the constitution.

(a) Where the legislature has itself spoken in the creation of a district such as this, and where the legislative determination may be deemed to depend upon a question of fact, it is conclusively presumed that the legislature took evidence in its determination, and the decision which it has reached will not be subject to review by the courts. The latter will confine themselves exclusively to questions appearing upon the face of the statute itself. (*Stevenson* v. *Colgan,* 91 Cal. 649, [25 Am. St. Rep. 230, 27 Pac. 1089] ; *Rankin* v. *Colgan,* 115 Cal. 529, [47 Pac. 357] ; *Smith* v. *Mathews, post,* p. 752, [103 Pac. 199].) Says Judge Cooley (Constitutional Limitations, p. 220): "If evidence was required, it must be supposed that it was before the legislature when the act was passed, and if any special finding was required to warrant the passage of the particular act, it would seem that the passage of the act itself might be held equivalent to such finding." This court has said, commenting upon this language: "This view seems to be sustained by the decisions of the highest courts of other states and is in harmony with the central idea of the constitution in prescribing the independence and equality of the three great departments of the state." (*Stevenson* v. *Colgan,* 91 Cal. 649, [25 Am. St. Rep. 230, 27 Pac. 1089].) Speaking directly upon this subject-matter, the supreme court of the United States has said (*Fallbrook Irr. Dist.* v. *Bradley,* 164 U. S. 112, 174, [17 Sup. Ct. 56, 69]) : "It has been held in this court that the legislature has power to fix such a district for itself without any hearing as to benefits, for the purpose of assessing upon the lands within the district the cost of a local, public improvement. The legislature, when it fixes the district itself, is sup-

posed to have made proper inquiry, and to have finally and conclusively determined the fact of the benefits to the land included in the district, and the citizen has no constitutional right to any other or further hearing upon that question. The right which he thereafter has is to a hearing upon the question of what is termed the apportionment of the tax, i. e., the amount of the tax which he is to pay."

(b) Upon the amount of the tax which the landowner is to pay, the scheme by which that amount is to be apportioned and assessed has been outlined above. It will be remembered that after disinterested persons have made their assessment, a notice of the time and place of the sitting of the board of drainage commissioners for the purpose of equalizing the assessment is to be given; the board is to hear complaints and correct errors, and its determination is declared to be final. It is insisted that this either creates a court or confers judicial powers upon executive and administrative officers, in violation of the constitutional provision of sections 1 and 5 of article VI of the constitution. That the board sitting to equalize the assessments acts judicially, must be conceded. The very purpose for which it sits is to act judicially for the correction of errors and abuses in the original assessment. But to say that for this reason the legislature has attempted to create a court in violation of the constitution is a proposition to which assent must be denied. Many acts, judicial in their nature, must of necessity be performed by the executive and administrative officers of the government. The decisions of such officers upon any controverted question, upon any question even in which there is play for discretion, are in their nature judicial. But because this is so, and necessarily so, it does not follow that they are usurping the exclusive functions of the courts of the land, and if they are not doing so, the power which they exercise may not be questioned. City councils and boards of supervisors annually fix the rates which water consumers within their territories shall pay to *quasi* public corporations furnishing such water. Here, these boards are called upon to consider and decide controverted questions of fact of great moment and of much nicety. Their decrees fixing rates contain many of the elements of a judgment. They are binding determinations upon the water company upon the one hand, and upon the consumer upon the other; yet,

the power of these boards to exercise such *quasi* judicial functions has been upheld. Upon this very subject the supreme court of the United States, speaking through Chief Justice Waite, has said: "Like every other tribunal established by the legislature for such a purpose, their duties are judicial in their nature, and they are bound in morals and in law to exercise an honest judgment as to all matters submitted for their official determination. It is not to be presumed that they will act otherwise than according to this rule." (*Spring Valley Water Works Co.* v. *Schottler,* 110 U. S. 347, [4 Sup. Ct. 48].) And, after quoting this language, that same court, speaking of the power of the board of supervisors under the irrigation district laws to pass upon the question of benefits, says: "In that case the board was to fix the price of water, while in this it is to determine the fact of benefits to lands. The principle is the same in each case." And, in this connection, it is declared that such a board, having the power to hear and determine the question of benefits, is a proper and sufficient tribunal to satisfy the constitutional requirements of due process of law. (*Fallbrook Irr. Dist.* v. *Bradley,* 164 U. S. 169, [17 Sup. Ct. 67].) And so in *Hagar* v. *Rec. Dist.,* 111 U. S. 701, [4 Sup. Ct. 663], where the same subject is under discussion, it is said: "But where a tax is levied on property not specifically but according to its value, to be ascertained by assessors appointed for that purpose upon such evidence as they may obtain, a different principle comes in. The officers in estimating the value act judicially; and in most of the states provision is made for the correction of errors committed by them, through boards of revision and equalization, sitting at designated periods provided by law to hear complaints respecting the justice of the assessments. The law in prescribing the time when such complaints will be heard, gives all the notice required, and the proceeding by which the valuation is determined, though it may be followed, if the tax be not paid, by a sale of the delinquent's property, is due process of law." Against a fraudulent exercise of this power, recourse may of course be had to the courts. (*Board etc. of Modesto Irr. Dist.* v. *Tregea,* 88 Cal. 334, [26 Pac. 237].) But otherwise, the requirement of due process of law is satisfied in the creation of this tribunal, with the powers conferred upon it to hear and correct errors and abuses, upon reasonable notice to the property owner.

6. The members of the board of drainage commissioners, as the board is constituted, are not disqualified by interest to act as a tribunal to hear objections to the assessment by reason of the fact that they are landowners within the district. Members of boards of supervisors and of city councils, in adjusting water rates, are themselves consumers and to that extent have an interest in the subject-matter of their decision; but they are not therefore disqualified. The principle is the same in this case. (Hamilton on Special Assessments, p. 138; *Hibben* v. *Smith,* 191 U. S. 310, [24 Sup. Ct. 88].)

7. Nor is there a double tax upon the land. The special assessment for benefits is upon the theory that, to the amount of such assessment, the land is directly benefited. Such general tax as the land may pay to the state, stands upon an entirely different foundation. The owner of land fronting upon a street, who is assessed for special benefits for the street work, does not suffer double taxation because that land is again subjected to general tax by the city or state, even though a portion of the money so derived should go to the maintenance of the highway in front of his property.

8. The act in terms does not attempt to impair the obligation of existing contracts. The state has the undoubted right to vary its plans for the reclamation of these lands, and in so doing to create new or different agents and mandatories. If in the operation of its new laws an attempt should be made to impair vested rights, the attempt, upon proper showing before a court, would unquestionably be held nugatory.

9. No violence is done by the act to the constitutional inhibition against requiring a property qualification for a voter. (Const., art I, sec. 24.) This objection is completely disposed of by *People* v. *Reclamation District No. 551,* 117 Cal. 114, [48 Pac. 1016]. The assessments are for local improvements, not for general purposes of taxation, and the legislature permits the landowners to appoint their own agents. The method which it imposes upon the landowners in making the selection is wholly within its control; for, as has been said, it is not compelled to give the landowners any voice in that selection.

We have thus discussed all the points advanced upon appeal and pertinent to this consideration under *quo warranto.* The questions presented arise upon the rulings of the court in striking out portions of the petition and in sustaining a general demurrer thereto.

For the reasons above given the rulings complained of were correct, and the judgment appealed from is affirmed.

Melvin, J., Shaw, J., Angellotti, J., Sloss, J., and Lorigan, J., concurred.

The chief justice being a landowner within the boundaries of the Sacramento Drainage District, did not participate in the foregoing.