[Civ. No. 1997. Third Appellate District.—March 19, 1919.]

ARGYLE DREDGING COMPANY (a Corporation), Petitioner, v. JOHN S. CHAMBERS, as Controller, etc., Respondent.

[1] RECLAMATION BOARD ACT — NATURE OF DISTRICT — FORMATION — POWER OF LEGISLATURE.—Reclamation districts are, in strictness, not corporations at all, but rather governmental agencies to carry out a specific purpose—the agency ceasing with the accomplishment of the purpose. It would be perfectly legal and competent for the legislature, delimiting a tract of land, itself to appoint a commissioner or commissioners to perform all of the functions which, under the existing schemes, are performed by the trustees and the assessors.

[2] CONSTITUTIONAL LAW — SPECIAL LAWS — LEGISLATIVE POWER.—The constitution does not deprive the legislature of the power to pass all special acts; but forbids special laws in all cases where a general law can be made applicable.

[3] RECLAMATION BOARD ACT—SACRAMENTO AND SAN JOAQUIN DRAINAGE DISTRICT—PURCHASE OF WARRANTS BY STATE—SPECIAL LEGISLATION.—The act of January 30, 1919, "authorizing the State Board of Control to purchase warrants of the Sacramento and San Joaquin Drainage District issued in payment for the expense of continuing the construction of the east levee of the Sutter By-pass; appropriating money therefor, and providing reimbursement to the State of such appropriation," is not unconstitutional as violative of section 25, article IV, of the state constitution, which prohibits special laws in all cases where a general law can be made applicable.

[4] ID.—LENDING CREDIT OF STATE—MAKING GIFT—CONSTITUTIONALITY OF ACT.—Such act of January 30, 1919, does not violate section 31, article IV, of the state constitution, which prohibits the giving or lending the credit of the state or making a gift "to any individual, municipal or other corporation whatever."

[5] ID.—ACT OF JANUARY 30, 1919—CONSTRUCTION OF—EFFECT OF AP-
PROPRIATION OF MONEYS.—Such act of January 30, 1919, is neither
more nor less than an act authorizing the state board of control to
invest state money in the warrants duly and regularly issued under
the act.    The fact that an appropriation of moneys was made to
meet the anticipated purchase did not affect the power of the legis-
lature to make the appropriation or the power of the board to make
the investment.

PROCEEDING in mandate originally instituted in the Dis-
trict Court of Appeal to compel the state controller to issue
his warrant in payment of petitioner's claim.    Peremptory
writ ordered issued.

The facts are stated in the opinion of the court.

James S. Spillman and Chas. H. Oatman  for Petitioner.

John W. Carrigan and Jas. L. Attridge  for Respondent.

U. S. Webb, Attorney-General, for State of California.

Robt. T. Devlin, *Amicus Curiae.*

CHIPMAN, P. J.—This is an application for a writ of
mandate compelling the controller to issue his warrant for the
payment of plaintiff's claim.    As the matter was one of emer-
gency and as at the argument we were fully convinced that
the writ should issue, it was so ordered from the bench.    By
the request of all parties we will state the case and the reasons
for our conclusion.

It appears from the petition as follows:    That the Sacra-
mento and San Joaquin Drainage District is "a body politic
and corporate created by the act of the legislature of this
state, approved December 24, 1911" (Stats. 1911, Extra
Session, p. 117), as amended and supplemented by the act
of May 26, 1913 (Stats. 1913, p. 252), and was further
amended and supplemented by the act of June 9, 1915 (Stats.
1915, p. 1338), which said act of 1911, as amended by said
act of 1915, "is known and designated and referred to as the
'Reclamation Board Act' as provided in section 31 of said acts
as so amended and supplemented"; that the reclamation
board referred to in the petition was created and exists as
provided for in said Reclamation Board Act; "that the man-

agement and control of the said Sacramento and San Joaquin Drainage District is by virtue of section 5 of said Reclamation Board Act vested in the said reclamation board." We quote from the petition:

## "V.

"That pursuant to the provisions of said Reclamation Board Act the said Reclamation Board did, in accordance with the provisions of section 13 of said Reclamation Board Act, adopt and determine upon a certain portion or project of the plans to be carried out by said Board and did designate the same by the name and number of 'Sutter-Butte By-pass Project Number Six' and did pass its order and resolution for the levying of an assessment in the sum of more than $10,000,000.00 upon the lands within said Sacramento and San Joaquin District to be benefited thereby, as might be determined in the manner provided by law, and did direct that said assessment be known and designated as 'Sutter-Butte By-pass Assessment Number Six,' and did appoint three assessors for the purpose of making said assessment, all in the manner required and provided by said Reclamation Board Act.

## "VI.

"That a part of the said Sutter-Butte By-pass Project Number Six so adopted and determined upon by said Reclamation Board is the construction of a levee along the East line of a by-pass in Sutter Basin, in Sutter County, California, known as the Sutter By-pass, the said levee being known and designated as the East levee of the Sutter By-pass.

## "VII.

"That after the adoption of said Sutter-Butte By-pass Project Number Six the said Reclamation Board, acting for and on behalf of the said Sacramento and San Joaquin Drainage District, entered into a contract with your petitioner for dredging work to be done by the dredger Argyle in and about the construction of the said East levee of the Sutter By-pass. That pursuant to said contract, and in the summer of 1918, your petitioner commenced work upon said East levee of the Sutter By-pass with the said dredger Argyle, which work has been prosecuted continuously ever since. That on the 1st and 2d days of February, 1919, your petitioner, pursuant to said contract, performed work upon the construction of the said East levee of the Sutter By-pass, for which work so performed on said two days your petitioner was entitled to be paid by

said Reclamation Board for and on behalf of said Sacramento and San Joaquin Drainage District the sum of $255.00 according to the terms of said contract.

## "VIII.

"That thereafter the claim of your petitioner for said sum of $255.00 against the said Sacramento and San Joaquin Drainage District, acting by and through the Reclamation Board, was duly presented to and allowed by the said Reclamation Board, and was thereafter submitted to the State Board of Control for its scrutiny and approval, and was thereafter approved by the said State Board of Control, and thereafter, and on February 20th, 1919, a warrant numbered 24,274, was duly drawn by the State Controller upon the State Treasurer in favor of your petitioner for said sum of $255.00, payable out of the said Sutter-Butte By-pass Assessment Number Six, for the amount of the said claim of your petitioner, which said warrant was thereupon and on said day by the said State Controller delivered to your petitioner and was by your petitioner on February 21st, 1919, presented to the State Treasurer for payment, but there were no funds in the hands of the State Treasurer to pay the said warrant when so presented, and the said State Treasurer did thereupon register the said warrant and did endorse on said warrant the date of said presentation and the fact that it was not paid for want of funds, all as provided in and by Section 15 of the said Reclamation Board Act.

## "IX.

"That the Legislature of this State now in session passed an act entitled, 'An act Authorizing the State Board of Control to purchase Warrants of the Sacramento and San Joaquin Drainage District Issued in Payment for the Expense of Continuing the Construction of the East Levee of the Sutter By-pass; Appropriating Money Therefor, and Providing for Reimbursement to the State of such Appropriation,' which said act was approved by the Governor of this State on January 30th, 1919. That a copy of said act is hereunto annexed and marked Exhibit 'A', and is hereby referred to and made a part hereof. That said Legislature did, in Section 6 of said act, declare that it deemed it necessary for the immediate preservation of the public health and safety that said act should go into immediate effect, and did in Section 6 of said act set forth a statement of the facts constituting such

necessity, which said Section of said act was passed by each house of said Legislature upon an aye and nay vote upon a separate roll call thereon, as provided by Section 1 of Article IV of the Constitution of this State. That it was further determined and declared by said Legislature in and by Section 6 of said act, that said act constituted an urgency measure which under the provisions of Section 1 of Article IV of the Constitution of the State of California should go into immediate effect; and that said act did go into effect immediately upon the signing and approval of the same by the Governor of this State on January 30th, 1919.

"X.

"That on February 27, 1919, your petitioner, being then the owner and holder of said warrant for $255.00 payable out of the said Sutter-Butte By-pass Assessment Number Six, did offer to sell said warrant at par to the State Board of Control, pursuant to the provisions of said last named act; and the said State Board of Control did thereupon and then and there accept said offer, and did purchase said warrant from your petitioner at the price of $255.00, being the par value thereof, and did prepare and approve a claim in favor of your petitioner for said sum of $255.00 in payment therefor, payable out of the appropriation of $300,000 made by said last named act, and did present said claim to the respondent, John S. Chambers, who is and then was the Controller of the State of California, and did request said respondent as such Controller to draw a warrant upon the State Treasurer payable out of said appropriation of $300,000 for the sum of $255.00 in favor of your petitioner, in payment of the purchase price of said warrant of like amount so purchased by said Board of Control as aforesaid. That said respondent as such State Controller then and there refused and still refuses to draw said warrant as so requested by said Board of Control, or otherwise, or at all.

"XI.

"That said appropriation of $300,000 was so made by said act of January 30th, 1919, there was in the State Treasury, and not otherwise appropriated, a sum of much more than said sum of $300,000. That no part of said appropriation of $300,000.00 made by said last named act has ever been drawn or expended, but the same remains in the State Treasury subject to the provisions of said act.

## "XII.

"That the drawing of said warrant as so requested by said State Board of Control is an act which the law specially enjoins upon the said respondent as such State Controller as a duty resulting from his office."

A demurrer to the petition was interposed by respondent on the following grounds:

1. That the act of January 30, 1919, violates section 21 of article I of the constitution of the state of California, in that it is class and special legislation; that it is giving or lending the credit of the state in violation of section 31 of article IV and in making an allowance for compensation on a contract for services rendered under contract unauthorized by law.

2. That it cannot be ascertained from the petition who is the real party in interest.

3. That the petition does not state facts sufficient to constitute a cause for granting the writ prayed for.

The insufficiency of the facts or the failure to disclose who is the real party in interest was not seriously urged. Nor do we think either point well taken. Unless the act in question is unconstitutional, *mandamus* is the appropriate remedy and the facts alleged were sufficient to justify the issuance of the writ. It clearly enough appears that petitioner is the real party in interest.

Is the act of January, 30, 1919, violative of the constitution? It becomes necessary to ascertain the nature and character of the Sacramento and San Joaquin Drainage District.

The validity of the Reclamation Board Act is not called in question. The constitutionality of acts of this character was established and set at rest in the case of *People ex rel. Chapman* v. *Sacramento Drainage District,* 155 Cal. 373, [103 Pac. 207].

The origin, administrative and legislative history of the Reclamation Board Act, its nature, and character were concisely stated at the argument by Mr. Robert T. Devlin, who appeared *amicus curiae.* The statement accords with our information upon the subject, and we, therefore, take the liberty of using it. We quote from the notes written by our stenographic reporter:

"The problem of flood control has been a problem that has engaged the United States government and the state of California for more than half a century. For the last fifty years

40 Cal. App.—22

the United States government has been engaged in studying
the flood condition of the Sacramento Valley, for the purpose
of preventing floods and increasing the navigability of the
river. The state of California has been engaged in the same
work. They sent for Mr. Eads, who had control of the
Mississippi River, to come to California and make a report.
He reported a plan for the improvement of the Sacramento
River to prevent the very things that this act now before us
was to do. The United States government made its report
through Col. Mendel and others. In 1893 the debris commis-
sion was formed; first, to see that hydraulic mining should
not be continued without permits; and, second, to take steps
to restore the navigability of the river to the condition which
it was in 1851 or 1852, about the time California was ceded
to the Union. California again, when Governor Pardee was
governor, provided for a commission and invited three en-
gineers to come to California, one of them being Colonel
Dabney, having charge of the Mississippi work. They made
a report. The United States government was investigating
this matter all the time and finally there culminated what is
called the Captain Jackson report, which was made in 1911.
That report was a report having for its object three things;
first, the restoration of the navigability of the Sacramento
River; secondly, the prevention of disastrous floods; and
thirdly, incidentally, the reclamation of private land. That
report, Document 81, said that those three objects were inex-
tricably involved, so you could not improve flood conditions
and the navigability of the stream without aiding the land
owner. The matter was of such importance to the state of
California that Governor Johnson, in convening the legisla-
ture in special session, made it as one of the objects to be
legislated upon. He named eight or nine objects of such im-
portance to the people that the legislature should be convened
for the purpose of considering them, and one of the objects
was the consideration of the report of Captain Jackson. At
the special session in 1911 the legislature of this state adopted
that report of Captain Jackson as a part of the state policy
and declared that part of the work should be carried out. In
1911, in pursuance of that plan, the state of California con-
stituted the reclamation board and provided for the appoint-
ment of three commissioners and provided that all future
works in California should be in conformity with that report.

Two years following, the state of California created the Sacramento and San Joaquin Drainage District, referred to in this petition, being a territory including the Sacramento and San Joaquin Valleys determined by state engineers as being territory subject to flood control and flood injury and provided that that board might carry on the work which is described in this petition.   Subsequently, in 1917, the national Congress adopted the Jackson report and appropriated six million some odd thousand dollars for the purpose of carrying it out, to be used in conjunction with appropriations of like amounts made by the state of California, with the provision on the part of the United States government that the obligation of the United States should not exceed one million dollars per year.   The state of California has made those appropriations, and to-day and for the last several years past, as a part of this work, the United States government and the state of California are co-operating in the lower parts of the Sacramento River in widening the river and in deepening its channel.   Now, this work is all one project.   This Sutter bypass taps the river at the north, conducts the water out through two series of levees to be built, making an adjoining river or an additional river, carries it down to the Fremont weir, clear across the Sacramento River into the Yolo Basin and down to tide water.   This work is carried out exclusively by a state agency and by a state board.   Captain Jackson's report stated that, roughly speaking, the obligation resting upon the United States and the state of California and upon the land owners might be divided into three parts, so the nation would pay one-third, the state one-third, and the land owners one-third, and that the total estimated cost of the entire project would be thirty-three millions of dollars, placing upon the state of California as a direct responsibility eleven million, upon the United States a like sum of eleven million dollars, and upon the land owners eleven million dollars. Owing to the fact that work progressed from time to time and a certain part of the work was done by private owners, this was reduced to a little more than eighteen million dollars, and upon that basis of eighteen million dollars the Congress of the United States has already appropriated one-third, six million dollars, binding the United States government to contribute over six millions to this work. . . .

"Some twenty-five or thirty years ago, the state of California tapped the Sacramento at Tisdale weir, by building a weir that allows the water to escape from the Sacramento River when it reaches a certain height, and that is the water that is doing the damage. By the state's action this water is taken out of the Sacramento River and thrown upon that territory on the east. For the purpose of taking care of that water, these by-passes are being constructed. If these by-passes are not constructed, this water that the state of California takes out of its own volition—nobody else has control of it—is taken out and dumped upon private land—up to some years ago, upon the lands known as District 1500, now upon the lands in District 1. In other words, the floods in that section are caused by the state government in taking water out of the river and dumping it on private lands. For the purpose of performing that governmental duty, the state of California is now building these by-passes. It has spent already more than one million dollars and has obtained the money by using its warrants, which warrants have been taken by private persons. We have now reached the point where private persons refuse to take warrants further."

It is well to recall what the supreme court said in *People* v. *Sacramento Drainage District, supra,* in speaking of districts of the character of the one here. **[1]** Said the court: "It is unnecessary to repeat the reasons set forth for the decisions in those cases (cases cited), by which the conclusion there reached was expressed, to the effect that such districts are, in strictness, not corporations at all, but rather governmental agencies to carry out a specific purpose—the agency ceasing with the accomplishment of the purpose. But, additionally, it may be said that the likeness of these agencies to corporations is superficial, and that the similitude—for it is no more than this—ceases, if consideration be paid to the fact that the state could accomplish this very work without organizing a district as such at all, and without giving the land owners within the district any voice in the selection of the managers or trustees. Thus it would be perfectly legal and competent for the legislature, delimiting a tract of land, itself to appoint a commissioner or commissioners to perform all of the functions which, under the existing schemes, are performed by the trustees and the assessors."

The act of 1911 created the reclamation board to consist of three members; adopted the plan of the California debris commission, empowering the board to make modifications, as a general scheme for reclamation flood control in the Sacramento Valley. The act of 1913 enlarged the board to seven members, created the San Joaquin and Sacramento Valley drainage district, and authorized the reclamation board to go forward with the construction of the project and to levy assessments on lands in the district in aid of that purpose. The act provided that in the carrying out of the work the board should divide it into separate projects or divisions, each to be taken up separately and a separate assessment levied therefor, each such project to have a distinctive name and number and its funds to be held separately.

These assessment funds are to be collected by the county treasurers in the counties affected and by them to be deposited in the state treasury and paid out by the state treasurer on warrants drawn by the controller against the state treasurer, as directed by the reclamation board, payable out of that particular assessment in each such separate project. Warrants may be drawn against any assessment whenever it has been ordered by the reclamation board and the assessors have been appointed; these warrants may issue for work before the assessments are collected and when thus drawn may be presented to and registered by the state treasurer, who is authorized to register them and indorse them "not paid for want of funds," and they shall thereafter bear interest from date of registration.

As alleged in the petition, the reclamation board adopted a project, known as Sutter-Butte by-pass project No. 6, and levied an assessment for its construction, known as Sutter-Butte by-pass assessment No. 6, and appointed the assessors therefor. At this stage the controller was authorized to draw warrants for construction work against this assessment on the request of the reclamation board, in anticipation of collections on the assessment. The reclamation board was able to make contracts for work on the east levee of this by-pass, being part of the project No. 6, payable in warrants against its assessment No. 6. Arrangements were made whereby private interests cashed these warrants to a very considerable amount. This arrangement having ended and the necessity for the

uninterrupted prosecution of the work being imperative, the act of January 30, 1919, was passed to meet the emergency.

This act, in effect, appropriated the sum of three hundred thousand dollars, and authorized the state board of control to purchase at their face value (to the extent of not exceeding said amount) any or all warrants of said drainage district drawn by the state controller, as provided by the Reclamation Board Act and payable out of said assessment and "issued in payment for the expense of continuing the construction of the east levee of the Sutter by-pass." Section 5 of said act provides: "The State Controller shall draw warrants upon the State Treasurer, payable out of said appropriation, in such amounts and at such times and in favor of such persons as the Board of Control may request, and the State Treasurer shall pay the same." After the passage of this act, petitioner, Argyle Dredging Company, continued to work under contract with the reclamation board and the claim here was allowed for $255 for such work. It was duly allowed by the reclamation board and approved by the board of control, the state controller drew and issued to petitioner his warrant against the reclamation board's assessment No. 6, for $255, and it was registered by the state treasurer as not paid for want of funds. No question arises as to the regularity of the proceedings. The state board of control, however, contracted with petitioner, proceeding under the act of 1919, to purchase this warrant at its face value, and requested the state controller to direct the payment out of the fund thus appropriated. This the controller refused to do and hence the action.

[2] The constitution does not deprive the legislature of the power to pass all special acts. It forbids special laws in all cases where a general law can be made applicable. (Sec. 25, subd. 33, art. IV.) It was said by the supreme court: "The legislature must, in the first instance, determine whether or not a general law can be made applicable in the particular case. The court will not interfere with its judgment on the subject, unless it clearly and beyond a reasonable doubt appears that it adjudged contrary to the fact." (*Wheeler* v. *Herbert,* 152 Cal. 224, 232, [92 Pac. 353, 357], citing cases.) It does not appear and it is not claimed that conditions such as prevail in the Sacramento and San Joaquin drainage district exist elsewhere in the state, nor do we think that a gen-

eral law could reasonably be made applicable. But as was said in *People* v. *Mullender,* 132 Cal. 217, 222, [64 Pac. 299, 301]: "We certainly would not hold such a law invalid merely because it would, in our opinion, have been possible to frame a general law under which the same purpose could have been accomplished." It was also there said: "The language of said paragraph (sec. 25, art. IV) plainly implies that there can or may be cases where a local or special act may be wise and salutary and appropriate, and in no wise promotive of those evils which result from a general and indiscriminate resort to local and special legislation." [3] Such, in our judgment, is the case here.

[4] In no just sense can the act be said to violate section 31, article IV, which prohibits the giving or lending the credit of the state or making a gift "to any individual, municipal or other corporation whatever." As we have seen (*People* v. *Sacramento Drainage District,* 155 Cal. 373, [103 Pac. 207]), reclamation districts "are, in strictness, not corporations at all, but rather governmental agencies to carry out a specific purpose—the agency ceasing with the accomplishing its purpose." So completely are these districts so regarded, as we are informed, that their warrants are not taxable nor is the interest payable on those warrants taxable by the United States as income; so, also, are the salaries of the officers of such districts not subject to the payment of an income tax for the reason that the government regards them as part of the state.

Much more closely is the Sacramento and San Joaquin drainage district knitted to the state and really part of it than is the ordinary drainage district. Section 7 of the Reclamation Act of 1915 declares that "the State of California and the people thereof are hereby declared to have a primary and supreme interest in having erected, maintained and protected on the banks of the Sacramento and San Joaquin rivers and their tributaries and the by-passes and overflow channels and basins mentioned herein, good and sufficient levees and embankments or other works of reclamation, adequately protecting the lands overflowed or subject to overflow by said streams, . . . and it shall be the duty of the reclamation board at all times to enforce on behalf of the State of California and the people thereof the erection, maintenance and protection of such levees . . . as will, in their

judgment, best serve the interests of the State of California. The purposes and objects of this act are to carry into effect the plans of the California Debris Commission with such modifications and amendments and such additional plans as have been or may hereafter be adopted by the reclamation board for the control of the flood waters of the Sacramento and San Joaquin rivers and their tributaries and said basins and to vest in said reclamation board control and jurisdiction over said plans."

We then have an institution, a state agency, created by the state, under the exclusive control and management of the state, administered by officers appointed by the Governor of the state, and engaged in an enterprise of state-wide concern— the act itself providing that "The State of California and the people thereof are hereby declared to have a primary and supreme interest" in its objects and purposes.

[5] But, aside from these considerations, we think the act of January 30, 1919, is neither more nor less than an act authorizing the state board of control to invest state money in the warrants duly and regularly issued under the act precisely as that board may now and has been since its organization authorized by law to invest state funds in United States and state bonds, municipal bonds, school district bonds, highway and irrigation district bonds. The state has simply added another class of securities in which the board of control may invest state funds. The fact that an appropriation of moneys made to meet the anticipated purchase, in this particular instance, does not affect the power of the legislature to make the appropriation or the power of the board to make the investment. The act specifically provides for the payment of these warrants out of assessments, when collected, and when paid, the money goes back into the state treasury just as it would upon payment of any of said bonds purchased by the board of control.

In no view of the case can we see that either the legislature or the board of control has exceeded its authority. The demurrrer is overruled and it is ordered that the peremptory writ prayed for be issued.

Burnett, J., and Hart, J., concurred.