[Civ. No. 5414. Third Appellate District.—July 13, 1936.]

BANK OF HAWAII (a Corporation) et al., Petitioners, v. CALIFORNIA GIBSON, as Treasurer, etc., Respondent; MARY E. MORRIS, Intervener.

RECLAMATION DISTRICT No. 108 et al., Interveners, v. SACRAMENTO AND SAN JOAQUIN DRAINAGE DISTRICT et al., Respondents.

Athearn, Chandler & Farmer for Petitioners.

Clark, Nichols & Eltse for Intervener Morris.

Rutledge & Rutledge for Interveners Reclamation District et al.

U. S. Webb, Attorney-General, Neal Chalmers, Deputy Attorney-General, Arthur C. Huston, Downey, Brand & Seymour and Stephen W. Downey for Respondents.

SHIELDS, J., *pro tem.*—This petition arose out of a petition for a writ of *mandamus* filed by the petitioners herein, who are the owners of certain bonds issued by Reclamation District No. 108.

The petition recites that certain interest coupons of such bonds have matured; that they were presented to the respondent Gibson, who is the duly elected and acting treasurer of the county of Colusa, and as such, is the custodian of the funds of the said reclamation district; that their payment was demanded, and that such payment was refused. The petition further states that there are funds of the district in the hands of said respondent, legally applicable thereto, sufficient to pay all of said coupons of all of the outstanding bonds of said district, due and payable January 1, 1934, and to make additional payments on account of all outstanding coupons maturing July 1, 1934.

The prayer of the petition is that the respondent as such treasurer be required to pay the interest coupons of all outstanding bonds which matured January 1, 1934, in full, and to make a *pro rata* payment on account of all coupons of all such bonds which matured July 1, 1934. The intervention of Mary E. Morris is effected by a petition in which she states that she also is the owner and holder of a large number of bonds of Reclamation District No. 108, of the same issue and character as those of the petitioner, and that she holds matured interest coupons of said bonds in a large sum. She alleges that she has presented these coupons to the respondent as did the petitioner, and demanded payment thereof, and that as in the case of the petitioner, payment was refused. But this intervener does not make common cause with the petitioner, but alleged that she presented her coupons to the respondent before the presentation of those of the petitioner, and because of that fact claims a prior right to their payment. Her prayer is that out of the funds in the hands of the respondent, her coupons be paid in full before any of such funds should be applied to the payment of the coupons of the petitioner. Thereafter, and upon leave of this court, Reclamation District No. 108, and the trustees thereof, intervened and alleged that said district had in due course, and in accordance with law, levied an assessment upon all of the lands in the district in the total sum of $3,407,800.69. That on or about the 1st day of January, 1925, the said district, in conformity with the provisions of the Political Code and especially of section 3480 thereof, issued and sold its bonds in the sum of $3,142,000, based upon, and secured by the above-mentioned assessment, which was known and designated as "Assessment No. 5".

That the bonds now held and owned by the petitioner and by the intervener, Mary E. Morris, are a part of the issue of bonds above referred to. They then allege delinquency by a large number of landowners in the district in the payment of calls on account of the above-mentioned assessment, and that in due course, and in conformity with law, the lands upon which these calls were delinquent were offered for sale and were purchased by the respondent, county treasurer of Colusa County, as trustee for the district. That the total acreage so sold, and now held in trust

for the district is 17,614.84 acres. That since the acquisition of said lands the trustees of the district have leased and operated the lands as provided by law, and particularly by section 3466a of the Political Code, and that they have paid the proceeds thereof to the respondent herein who has deposited the amount thereof in the bond fund of the district. These interveners then allege that all of the lands of district No. 108 are included within the exterior boundary lines of the Sacramento and San Joaquin Drainage District, Project No. 6 thereof. That prior to the levying of assessment No. 5 of said district No. 108, the Sacramento and San Joaquin Drainage District levied and spread an assessment known as "Assessment No. 6" upon all of the lands within the boundaries of the said drainage district project No. 6, including all of the lands within the exterior boundaries of Reclamation District No. 108. This, of course, covered the 17,614.84 acres in said district owned and held as above stated by the district.

It is further stated that the Sacramento and San Joaquin Drainage District called four 3½ per cent instalments of said assessment No. 6. That there is now due and delinquent on account of such four calls against the lands in the district owned and held by it, the sum of about $25,000.

That the state reclamation board, which is the governing board of the Sacramento-San Joaquin Drainage District, has directed that all lands upon which these 3½ per cent calls are delinquent, including the 17,614.84 acres owned by the reclamation district, be sold to realize the amount of such calls. This intervener then states that there is doubt as to the relative character and validity of these two overlapping liens, and as to how, in case of a sale by the drainage district for these delinquencies, the title of the reclamation district to its 17,614.84 acres would be affected, and as to whether a purchaser at such a sale would acquire a title superior to, or on a parity with the last-named district. Interveners then contend that under the law, and particularly section 3466a of the Political Code, it is their duty to protect the title to lands held by them or by the respondent for the benefit of the district, and that if they had any funds with which to do so, that they should pay the four delinquent calls above mentioned, and thus protect the lands owned by them from the sale for delinquency, as proposed.

They then allege that they had collected as returns from the rental of the above-mentioned lands for the year 1934, the sum of $89,049.90 and as hereinabove alleged had paid this sum to the respondent who had placed the same to the credit of the bond fund of the district. That the sum of the four delinquent calls on the 17,614.84 acres of the district is about $25,000 and that this indebtedness could be paid in warrants of the district, which can be purchased in the open market for 60 per cent of their face value, from which it appears that the total obligation of the district on account of these four delinquent calls can be released by the expenditure of about $15,000. They then state that they deem it to be their duty, and for the best interest of all persons concerned, that this sum should be paid; that they have no funds with which to pay this sum or any sum, except the $89,049.90 received by them as rentals for the lands held and owned by them, and as above stated, paid into the bond fund of the district.

They then pray for a mandate to the respondent as trustee of the district, directing her to pay to the trustees of the district from such moneys in the bond fund a sum sufficient to purchase warrants of the Sacramento and San Joaquin Drainage District with which to discharge the delinquency of the four 3½ per cent calls. They finally ask that the Sacramento and San Joaquin Drainage District be brought into this proceeding so that the nature and *quantum* of title of any purchaser of lands at their proposed sale might be adjudicated and determined herein. Pursuant to this demand and upon an order of this court, the state reclamation board, answering for itself and the Sacramento and San Joaquin Drainage District, of which it is the governing body, set forth the outlines of the history of the creation and activities of the Sacramento and San Joaquin Drainage District. This need not be set forth here, as all of the facts connected with this matter are now a part of the history of the state, and in so far as is necessary to the understanding of the question presented here, are stated in *Gray* v. *Reclamation District No. 1500,* 174 Cal. 622 [163 Pac. 1024]; *People* v. *Sacramento Drainage District,* 155 Cal. 373 [103 Pac. 207]; *American Flood Control District* v. *Sweet,* 214 Cal. 778 [7 Pac. (2d) 1030]; *Sacramento & San Joaquin Drainage District* v. *Riley,* 199 Cal. 668 [251 Pac.

207] ; *Argyle Dredging Co.* v. *Chambers,* 40 Cal. App. 332 [181 Pac. 84] ; *Reclamation Board, etc.,* v. *Chambers,* 46 Cal. App. 476 [189 Pac. 479].

It is enough to here state that a plan for controlling the flood waters of the Sacramento and San Joaquin Rivers and their tributaries, for improving and preserving navigation, and for the reclamation and protection of the lands adjacent to these waters, was prepared by the California debris commission, and was by the secretary of war transmitted to the speaker of the house of representatives on the 27th day of June, 1911.

That by an act of the legislature of this state, chapter 25, Statutes of 1911, Extra Session, this report was approved and became a part of the law of California. That by this act the state reclamation board was created for the purpose of carrying the purposes of that plan into execution. That subsequently, this act was amended in 1913, to create the Sacramento and San Joaquin Drainage District. That thereafter, the state reclamation board levied what was known and has been repeatedly referred to as ''Sutter-Butte By-pass Assessment No. 6'', which assessment became a lien on all of the lands in question here on the 25th day of April, 1922. That four 3½ per cent calls were made upon this assessment, and that all of the lands hereinabove stated to have been owned by Reclamation District No. 108, were and are delinquent upon these assessments. The answer then refers to the very large contributions of money made by the national and state governments to be applied to the satisfaction of the assessments upon all of the lands included in the Sacramento and San Joaquin Drainage District, and as to how, through such assistance, it was proposed that the entire assessment then a lien upon such lands, and upon the 17,614.84 acres owned by the reclamation district would be released, provided that the full amount of the four 3½ per cent calls, together with interest and penalties, should be paid. That the total amount of assessment against all of the lands owned by district No. 108 is $373,433.51, and that this total assessment can be removed and will be released upon the payment of the sums of the four 3½ per cent calls which total $27,602.95.

That there are outstanding warrants of the district with which this $27,602.95 can be paid, and that these warrants

can be purchased for 60 per cent of the face value thereof, and that as a consequence, the vast total of assessments upon the lands in question herein, amounting to $374,433.51, will be released and discharged at a cost to the district of approximately $16,561.77.

The state reclamation board and the Sacramento and San Joaquin Drainage District then join with Reclamation District No. 108, and the trustees thereof, in asking that the respondent be required to pay to the trustees of district No. 108 a sum sufficient to enable them to purchase the warrants necessary to procure the release of their lands from the heavy assessment thereon.

As a result of these rather involved circumstances many questions have been suggested to the court and pressed for decision, but only three of these are directly presented by the issues, and to these we will strictly confine ourselves. The first is, in what order shall the matured interest coupons be paid, *pro rata*, until the available funds are exhausted, or in the order of their presentation? It seems very clear that this question is no longer an open one. As early as 1932, in the case of *Rohwer* v. *Gibson*, 126 Cal. App. 707 [14 Pac. (2d) 1051], it was held that where the amount of money in the hands of the treasurer of a reclamation district was insufficient to pay all the matured interest coupons of bonds of the district, that it was the duty of the treasurer to pay these obligations *pro rata*. This holding was based upon the theory that where a fund was charged with obligations of similar character, all of equal equity, and held in various ownership, and where the fund is limited and insufficient to discharge them all, and could not be indefinitely replenished, that all of the holders of such obligations should be treated equally, for the reason that all of their claims were of equal equity. This case, and the rule it announced, has been repeatedly approved in this state and elsewhere. (*Kimball* v. *Hastings etc. Dist.*, 137 Cal. App. 687 [31 Pac. (2d) 417]; *Cooper* v. *Gibson*, 133 Cal. App. 532 [24 Pac. (2d) 952]; *Selby* v. *Oakdale Irr. Dist.*, 140 Cal. App. 171 [35 Pac. (2d) 125]; *River Farms Co.* v. *Gibson*, 4 Cal. App. (2d) 731 [42 Pac. (2d) 95]. See, also, *State* v. *Little River, etc.*, 334 Mo. 753 [68 S. W. (2d) 671]; *State* v. *Duncan*, 334 Mo. 733 [68 S. W. (2d) 679].)

We see no reason for disturbing a principle so firmly established and which has so much of equity and fair dealing to commend it. The rule of *pro rata* payments in this case should apply not only to the funds in the bond fund derived from assessment calls, but to moneys therein realized from rentals of the land as provided for by section 3466a of the Political Code.

The next question involves more difficulty. The Sutter-Butte by-pass assessment No. 6 became a lien upon all of the lands involved in that project, including all of the lands with which this proceeding is concerned on the 25th day of April, 1922. Assessment No. 5 of Reclamation District No. 108 was levied upon all of the lands in said district, including all of the lands involved herein, and became a lien thereon on the 8th day of December, 1923.

As hereinabove stated bonds were issued under the provisions of section 3480 of the Political Code, to cover this assessment, which bonds were issued, and were of the date of January 1, 1925. At the time of the levy of reclamation district assessment No. 5, and of the issuance of the bonds above mentioned for the payment of that assessment, section 3480 of the Political Code provided for calls upon such assessment for the purpose of paying such bonds as they matured and the annually maturing interest coupons thereon, and provided that in case of delinquency in the payment of any such calls by any landowner in the district, that after certain proceedings, the land might be sold, and that the treasurer of the district should "execute a deed to such purchaser upon such sale, conveying said property free of encumbrance, except state, county and municipal taxes, and the unpaid balance of said assessment". It was at a sale such as is thus provided for by section 3480, that district No. 108 became the owner of the 17,614.84 acres of land involved in this action.

At the time when the drainage district assessment No. 6 was levied and became a lien, and when reclamation district assessment No. 5 became a lien, and when the bonds to provide for the payment thereof were issued, section 14 of the Sacramento and San Joaquin Drainage District Act provided for calls upon account of its assessment and for sales in cases of delinquency in the payment of such calls, and provided that upon such sales the reclamation board should

"execute a deed to such purchaser, etc., conveying said property, free of all encumbrances except state, county and other municipal taxes, assessments levied or assessed by statutory authority, and the unpaid balance of all assessments of said Drainage District". (Stats. 1921, p. 1486.) The four $3\frac{1}{2}$ per cent calls made by the drainage district became delinquent upon much of the land within its boundaries including the 17,614.84 acres in question here, and it is to foreclose such delinquencies that the drainage district now proposes to sell all of such lands. It is because of this proposed sale that Reclamation District No. 108 and its trustees, and the state reclamation board have intervened herein, and ask to have the effect of a deed by the state reclamation board in such circumstances determined. Intervener Mary E. Morris claims that the sale of the lands in question under the provisions of section 3480 of the Political Code, to the respondent as trustee for the reclamation district, foreclosed all preceding liens, except such as are specifically reserved by section 3480. The question as to whether or not it does, is the one presented to the court for decision. We think this question is definitely answered by the decision in the case of *La Mesa etc. Irr. Dist.* v. *Hornbeck*, 216 Cal. 730 [17 Pac. (2d) 143]. In that case the status of tax and assessment liens and titles derived through sales made in their foreclosure in cases of delinquency is very generally discussed. We need add nothing to what is said there to arrive at a decision of the case before us.

After a discussion of section 3787 of the Political Code, the court said: "This section has been construed by our own Appellate Court and by the Supreme Court of at least one other State which has enacted it into their law, from which it is concluded that the legislative intent is to place all taxes, both for county, municipal and other governmental agencies, and taxes in the form of assessments, in favor of special agencies of the State, upon an equal footing before the law." Continuing, the court says that "we may now safely conclude that under our system of taxation, liens in favor of County and municipal corporations and special assessments under the authority of State agencies for public purposes, are all on an equality. By this is meant that in case of delinquency, a deed to any one of these agencies for such taxes will not obliterate the existing liens on the property in

favor of any or all of the others.'' (*La Mesa Irr. Dist.* v. *Hornbeck, supra.*) The rule announced in this case was subsequently approved in *Neary* v. *Peterson,* 1 Cal. (2d) 703 [37 Pac. (2d) 82], although the parity of the conflicting liens there was declared to have been made so by statute. Counsel for petitioner herein seems to admit that the rule announced in the La Mesa case is broad enough to cover the case before us, but insists that that case has been practically overruled by the later decision of the court in *Conley* v. *Hawley,* 2 Cal. (2d) 23 [38 Pac. (2d) 408]. In this case the defendant, according to the facts stated in the opinion, had a deed from the state to property which the state had previously acquired through a sale for delinquent taxes. After the sale to the state a street assessment was levied on the property, and upon its nonpayment, the city treasurer executed a deed therefor to the plaintiff. The action was by the plaintiff to quiet his title as against the purchaser from the state. The question presented was whether or not land owned and held by the state in a proprietary capacity and not impressed with a public use was subject to special assessments for local improvements. The court held in conformity with well-established principles, principles approved and applied in the La Mesa case, that it was, and sustained the title to the party who purchased at a foreclosure sale for a street assessment. This was the case presented to the court, and the only point *decided.* Language in the case, not essential to its decision, is not in harmony with the La Mesa opinion. But it would be a rash judgment to conclude that in this modest case it was the purpose of the court to overrule the case of *La Mesa Irr. Dist.* v. *Hornbeck, supra.* This latter case was one of signal importance presented and heard with unusual care. Many able counsel were engaged in it; the case was first decided, after which a rehearing was granted, at which the points involved were elaborately argued before the cause was finally decided.

Three cases were involved and were consolidated, and the pleadings were particularly framed with a view to the presentation of all of the questions ultimately decided. The language in *Conley* v. *Hawley, supra,* which it is claimed reverses the rule as announced in the La Mesa case, is that used by the court in reference to the deed to the state after a sale for delinquent taxes, where the court says: ''The State,

therefore, by said tax deed, acquired said property free of all encumbrances," stating that "encumbrances" would include liens of all kinds. This no more than recites the words of the statute, without any effort to correlate that language with that of any other provision or statute, as was done in the La Mesa case. It does not appear that there were any liens on the property at the time the deed was made to the state, or if they were, whether or not they were prior tax liens imposed by the same authority as the one for the delinquency of which the sale was made. If there were any liens, they were not in controversy in the case, and no one representing them was before the court.

Other language in *Conley* v. *Hawley, supra,* to which significance is attached, is the statement in reference to the La Mesa case, that it only "involved the construction of section 3787 of the Political Code, as amended in 1927, and the priority of the respective liens therein mentioned". (*Conley* v. *Hawley,* Id. 27.) But the decision in that case involved much more than that. In that case (the La Mesa case), the previous sale to the state for delinquent taxes had included the foreclosure of two special assessments. Section 3787 has nothing to say as to the survival or merger of such assessment liens. That section simply provides that a deed by the state upon default in the payment of municipal taxes is subject to certain enumerated liens for local assessments. It does not state what would result from a reversal of this condition, namely, in case of a sale by a state agency during the existence of a tax lien in favor of the state, or where the state had made a sale to a purchaser. Section 3787 has nothing to say as to the relative strength or priority of the liens of overlapping assessments by different state agencies. Yet all of these questions were considered and decided by the court in *La Mesa Irr. Dist.* v. *Hornbeck, supra.*

It is too much to assume that the decision in this case, arrived at after so much consideration and counsel, was meant to be qualified by such a casual statement in *Conley* v. *Hawley, supra,* one not presented by the pleadings in the case, nor necessary to its decision.

But independently of the law as announced in the La Mesa case, the parity of the assessment lien of the Sacramento and San Joaquin Drainage District with that of Reclamation District No. 108 has abundant support in the

statutes and circumstances of its origin. A very brief review of the history of the drainage district and of its assessment No. 6 will justify this statement. Conditions in the area comprised within what later became the Sacramento and San Joaquin Drainage District, became such that the United States government took action for their improvement and correction. In 1893, by act of Congress, the California debris commission was created. Seventeen years later this commission made its recommendation to Congress advising that the great work which has since been nearly accomplished, be undertaken, and that the cost thereof should be borne equally by the three parties interested, the United States, the state of California, and the landowners within the proper area. This report met with the prompt approval of this state, and at an extra session, the legislature approved the report and pledged the state to its execution, provided that the federal government would cooperate as was recommended. (Stats. 1911, Ex. Sess., chap. 25.) This act provided for the appointment of a state reclamation board to have charge of the execution of the plan.

In 1913, the Sacramento and San Joaquin Drainage District was created, and the great project began to move forward. Assessments were made from time to time and appropriations were made by the state of California. In 1917, the federal government made its first pledge of support to the project, and in 1928, assumed full responsibility for its one-third cost of the completed work. For a full history of this great public enterprise, see *Gray* v. *Reclamation District No. 1500,* 174 Cal. 622 [163 Pac. 1024, 1029]; *People* v. *Sacramento Drainage District,* 155 Cal. 373 [103 Pac. 207]; *American River Flood Control District* v. *Sweet,* 214 Cal. 778 [7 Pac. (2d) 1030]; *Sacramento & San Joaquin Drainage District* v. *Riley,* 199 Cal. 668 [251 Pac. 207]; *Argyle Dredging Co.* v. *Chambers,* 40 Cal. App. 332 [181 Pac. 84]; *Reclamation Board* v. *Chambers,* 46 Cal. App. 476 [189 Pac. 479]. From these cases and the statutes which they review it will appear that the report of the California debris commission has been made a "part of the laws of the State"; in the execution of the work "the nation and the State have a common interest"; and as was said in *Gray* v. *Reclamation District No. 1500, supra,* in discussing the work committed to the administration of the state rec-

lamation board, "upon these matters the nation and the state are acting not only in harmony, but, it may be fairly said, under contract".

The above statements no more than follow the title of the act under which the state reclamation board is operating, which states that "the State of California and the People thereof are hereby declared to have a primary and supreme interest in having" the work of the drainage district carried into execution. In due performance of its duties and in the execution of its great task, the state reclamation board levied this assessment No. 6, and following it came vast sums of money from the state and the nation. It was in performance of its "contract" with the people and the federal government that the calls herein involved were made, and their collection is the means by which the state is to redeem its obligation. It must be held that when this work was undertaken and the acts passed through which, alone, the state reclamation board could collect its necessary funds, the legislature intended that that power of collection could not be taken away or impaired in the manner contended for here. The act creating the Sacramento and San Joaquin Drainage District is a special act, enacted to provide for the execution of a great public work of state and national concern. It provides for this one enterprise only. At its inception it was contemplated that both the state and the nation should cooperate in the manner in which they did. It would be unreasonable that the means provided for doing the work and maintaining the state's obligation to the nation should be at the will, and within the power to defeat, of every reclamation district within its wide borders. We believe the lien of the drainage district to be on a parity with that of the reclamation district, and that the sale of the lands herein involved to the latter did not destroy or defeat the lien of the drainage district.

■ The next question is the power of the trustees of Reclamation District No. 108, to expend a sum in the amount of about $16,561.77 in the purchase of warrants of the district, with which to discharge the delinquency of $27,602.95, on account of the four 3½ per cent calls on the assessment on the 17,614.84 acres of land owned by the district. If this delinquent assessment is in this way discharged, it will result in the total discharge of the lien of

assessment No. 6 on these lands now existing in the sum of $372,374.07. As appears above by the statement of facts herein the trustees of the reclamation district leased the lands which the district had previously purchased through foreclosure, as provided by section 3466a of the Political Code, and had realized as rentals therefrom the sum of $89,040.90. Under this section the trustees of the district are directed, after the collection of such rentals, to defray therefrom all necessary expenses incidental to the ''leasing and holding'' of the land, and in certain circumstances, to pay the remainder thereof to the treasurer of the district, to be placed to the credit of the bond fund thereof. In this case the trustees, not aware of the fact that the collection of the four 3½ per cent calls of assessment No. 6 would be pressed, nor of the advantages attendant upon the payment thereof, in the manner herein stated, paid the whole of said rental sum into the treasury, where it has been credited to the bond fund of the district. The trustees now ask that the treasurer of the district be required to pay to them, out of said moneys now in the bond fund of the district, a sum sufficient to enable them to discharge the lien of the four 3½ per cent assessments, as hereinabove set forth. It might be well to repeat that, as appears from the pleadings herein, by the expenditure of about $16,561.77 for warrants of the drainage district, the total sum of the four calls, amounting to $27,602.95, can be discharged, upon which the total remaining portion of all of assessment No. 6 on said lands, amounting to $372,374.07, will be released and discharged. The great advantage of doing this thing, to all persons concerned, including the bondholders, is very obvious and substantial. The trustees of district No. 108 have intervened in this proceeding, asking that they be permitted to expend the necessary sums from the money derived from this rental, to discharge this lien. They have thus declared their purpose to exercise such discretion as the statute gives them, in the matter of discharging this lien. We think that they have the power to do this under the statute. Section 3466a of the Political Code places all lands purchased by the treasurer, as trustee, under the ''management and control'' of the trustees. When they lease the lands, out of the funds derived therefrom, they must first pay the expenses of ''holding and leasing'' it. In determining what expendi-

tures are essential to the "management", and to the "control" of these lands, and are incident to "holding" them, some latitude must be allowed to the judgment and discretion of the trustees.

If the sale contemplated by the drainage district of all lands delinquent upon the four calls involved here is made, the purchaser will become a tenant in common with Reclamation District No. 108, and its ability to lease these lands and to secure the peaceful possession of their tenant, would be restricted and impaired. Surely, the present "control" of the reclamation district would become divided and limited.

The statute, in terms, provides that from moneys derived from rents, expenses of "holding" the lands must first be paid. It is a very reasonable construction of the word "holding" to say that it means preserving the "control" which the statute gives to the trustees. And as above appears, the only means by which the trustees of the reclamation district can maintain the control of the lands involved as against the purchaser at a sale by the drainage district is by the discharge of the lien of the latter. It must not be overlooked that this section (3466a) by direct provision empowers the trustees of the district to use its funds for the purpose of retiring liens against such lands "superior to the title of the County Treasurer therein". When it is recalled that the liens of the drainage district and the reclamation district are on a parity, and that the purchaser at a sale by the drainage district will become a cotenant of the reclamation district to the lands which are now in the sole possession, and under the individual control of the reclamation district, it becomes apparent that the co-interest of such purchaser to the extent to which it may limit the reclamation district's exclusive possession and management, is superior thereto. The statute directly provides that the trustees of the reclamation district may expend such funds as are here under discussion to "retire" such a lien as that of assessment No. 6.

The question of the withdrawal of funds from the bond fund of the district, as herein requested, seems to present little difficulty. The $16,561.17 necessary to discharge the lien of the instalment of assessment No. 6 should have been expended by the trustees before the rent money was deposited with the treasurer, and by her placed to the

credit of the bond fund. But the emergency here presented had not then arisen, and the money which, had the trustees foreseen the action of the state reclamation board, they would have used to pay the lien, was through mistake paid to the treasurer. The treasurer holds funds thus paid as a trustee for the district. No independent rights nor rights of strangers to the transaction have attached to the fund since its payment to the treasurer.

The bondholders cannot be said to have acquired any rights to moneys mistakenly paid into the bond fund, as this money was. All they were entitled to is what it is proposed to leave them; the balance remaining of the rent money after payment of the expenses of leasing and holding the land. There is no impediment to its return for the use to which it should have been applied before its deposit. (See 38 Cor. Jur. 672, sec. 218; *Kittredge* v. *Boyd*, 136 Kan. 691 [18 Pac. (2d) 563, 93 A. L. R. 574; Id., 137 Kan. 241 [20 Pac. (2d) 811, 93 A. L. R. 583].)

The writ prayed for will issue directed to the respondent herein as county treasurer of the county of Colusa,—

1. Commanding her to pay from funds now on deposit in the bond fund of Reclamation District No. 108, before any other funds are paid therefrom to the trustees of said district, a sum sufficient to purchase warrants of the Sacramento and San Joaquin Drainage District, Sutter-Butte By-pass Project No. 6, to satisfy the amount of all delinquencies against lands owned by said respondent as trustee for the district, in Reclamation District No. 108, the title to which has been acquired at public sale in payment of the delinquent instalments of assessment No. 5 of said district;

2. Commanding her to pay in full all outstanding interest coupons of the bond issue of said district which matured January 1, 1934; and to pay *pro rata* such funds of said district as remain in the bond fund thereof after the above payments have been made, upon the outstanding coupons of said bond issue which matured July 1, 1934.

Thompson, J., and Pullen, P. J., concurred.

An application by petitioners to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on September 10, 1936. Curtis, J., voted for a hearing.