[Civ. No. 11887.   First Dist., Div. One.   Aug. 31, 1942.]

LAURA SMITH, Respondent, v. BENNIE ADDIEGO et al., Appellants.

Will S. Robenson and Piccirillo & Wolf for Appellants.

Eugene K. Sturgis for Respondent.

GOODELL, J. pro tem.—This appeal was taken from a judgment and decree quieting respondent's title to four lots in El Cerrito.

On November 9, 1928, the lots were owned by Realty Syndicate Company and, under the act of 1911 (Stats. 1911, p. 730), the street improvement bonds here in question were a lien upon those lots. After several transfers, the bonds found their way into the hands of Guy E. Smith, the husband of respondent, who, on or about February 23, 1934, filed suit to foreclose them, and by a decree of foreclosure entered on November 2, 1935, the sale of the lots was ordered. On November 30, 1935, a certificate of sale was issued showing that the lots had been sold to Laura Smith, executrix of the will of Guy E. Smith; on January 2, 1938, a commissioner's

deed issued to her as such executrix and she later succeeded to her deceased husband's rights in the lots, and now claims title under such deed.

The appellants assert title under tax deeds. General taxes for 1929-1930 went delinquent and the lots in question were sold to the state on June 26, 1930. There having been no redemption, a deed to the state was made on June 29, 1935. On January 27, 1938, a sale was had at which the appellants or their predecessors purchased the lots, and on February 4, 1938, deeds were made to them by the tax collector, as agent for the state. Under these deeds the appellants claim absolute title to the lots, free and clear of any claim, lien or title based upon the street improvement bonds.

It is admitted by the appellants that the lien of the bonds attached as of November 9, 1928, several months before the lien for 1929-1930 taxes attached (on the first Monday of March, 1929). It is a fact, also, that the commissioner's deed was made a month before the tax deeds issued to appellants. Notwithstanding these priorities in point of time the appellants contend that their tax title is paramount because of the provisions of sections 3897 and 3898, Political Code, as those sections read when they purchased the tax title and got their deeds on February 4, 1938. They also invoke the rule laid down in *Woodill & Hulse Elec. Co.* v. *Young,* 180 Cal. 667 [182 Pac. 422, 5 A. L. R. 1296].

The respondent relies upon a group of cases (presently to be discussed) which held that liens for taxes, on the one hand, and certain other liens and special assessments, on the other, are of equal rank, such reliance being based upon the fact that section 3787, Political Code (see §§ 3518-3520, Rev. & Tax. Code), so declared at the time when the lots were sold *to* the state in 1935, from which premise it is argued that the title having thus become vested in the state, this equivalence of rank remained constant and undisturbed until and including the time when the commissioner's deed issued. Consistently with this position the respondent concedes that if she prevails herein her title should be quieted "subject to all county and city taxes . . . outstanding" when judgment is entered.

At the time when the lien of the street improvement bonds attached in 1928, and at the time when the deed *to* the state was made in 1935 (at which time the lien of the bonds had not been foreclosed), section 3787, Political Code,

declared the effect of such deed in the following language: ". . . Such deed conveys to the state the absolute title to the property described therein, free of all encumbrances, except any lien for taxes levied for municipal, or for irrigation, reclamation, protection, flood control, public utility or other district purposes, . . ." In *Neary* v. *Peterson*, 1 Cal. (2d) 703 [37 P. (2d) 82], the plaintiff sued to foreclose the lien of a street improvement bond issued under the same act of 1911. The defendant Brown set up the claim of ownership in himself by virtue of a tax deed from the state based upon a lien for 1923 general taxes. The trial court adjudged that Brown's tax title was paramount, which judgment was reversed. The Supreme Court in its opinion states the question to be decided as follows (p. 705): "Did the lien for taxes due the state destroy the lien of the improvement bond?" and then says: "This question, for all practical purposes, was answered by the recent case of *La Mesa etc. Irr. Dist.* v. *Hornbeck*, 216 Cal. 730 [17 P. (2d) 143], where it was held that by section 3787 of the Political Code the former priority of liens for general taxes was subordinated and they were placed on a parity with certain enumerated liens for special assessments." The court concluded (p. 706): "The liens are therefore on a parity, made so by statute, and the lien for the subsequent street improvement remained intact notwithstanding the sale" for taxes.

The La Mesa case, *supra,* reviews the history and evolution of section 3787 in the following interesting discussion (p. 736):

"In the light of these propositions we pause to ascertain whether or not the legislature of California has spoken upon the question of the relative priority of general taxes and special assessment liens. We note that under section 3788 of the Political Code as originally enacted in 1872 there was no mention made of liens or special assessments and a deed to the state at that time would no doubt have been construed as extinguishing liens for special assessments. Later, however, section 3788 became section 3787 and in the year 1913 (Stats. 1913, p. 559) this section was redrafted so as to except from its operation a lien of taxes levied for municipal purposes. Later, and in 1917, this section was again amended so as to except not only a lien for municipal purposes but for irrigation district purposes as well. Later, and in 1927 (Stats. 1927, p. 1666) the section was again amended so as to spe-

cially except a lien for reclamation, protection, flood control, public utility and other district purposes. This section has been construed by our own appellate court and by the Supreme Court of at least one other state which has enacted it into their law, from which it is concluded that the legislative intent is to place all taxes, both for county, municipal and other governmental agency purposes and taxes in the form of assessments in favor of special agencies of the state upon an equal footing before the law. (*Bolton* v. *Terra Bella Irr. Dist.*, 106 Cal. App. 313 [289 Pac. 678]; *State* v. *Board of Commrs.*, *supra*, [89 Mont. 37 (296 Pac. 1)].

"From the above authority and upon our construction of the section we may now safely conclude that under our system of taxation liens in favor of county and municipal corporations and special assessments, under the authority of state agencies for public purposes, are all on an equality. By this is meant that in case of delinquency a deed to any one of these agencies for such taxes will not obliterate the existing liens on the property in favor of any or all of the others unless, indeed, said section 3804a compels a different conclusion." The Bolton case, *supra*, was the first of this group of "parity" cases. The La Mesa case, *supra*, as we have seen, was followed in the Neary case, *supra*. Other somewhat similar cases relied upon by the respondent are *Conley* v. *Hawley*, 2 Cal. (2d) 23 [38 P. (2d) 408], and *Bank of Hawaii* v. *Gibson*, 15 Cal. App. (2d) 407 [59 P. (2d) 559]. The transactions out of which the Bolton, La Mesa, Neary and Conley cases arose occurred in the ten or twelve years just before 1931 and the decisions were, of course, controlled by the statutes then in effect. At all times after the 1927 amendment and down to 1939 (when it was transferred to the Revenue and Taxation Code), section 3787, Political Code, read as heretofore quoted—as construed in the "parity" cases. That section declared the effect of deeds *to* the state after the five-year redemption period had elapsed. But there was, during the same time, another section declaring the effect of deeds *from* the state to purchasers at tax sales. That section, 3898, Political Code, during the period when the "parity" cases arose —from 1920 (or theretofore) to 1931—read as follows: "Said deed shall . . . operate to convey all of the interest of the state in and to said property." This was virtually a "quitclaim," and nothing more. From what has just been said it will be seen that the only section which defined or declared

"the interest of the state" in and to the property conveyed by a tax deed *from* the state was section 3787, Political Code, which declared the effect of a deed *to* the state. In 1931 the statute was amended by the addition of a new section, numbered 3897a, which dealt with deeds *from* the state, and read as follows: "Except as hereinbefore provided, such deed shall convey to the grantee therein named the absolute title to the property described therein, free and clear of all encumbrances." At the next session the Legislature (Stats. 1933, p. 2585) re-wrote the section (numbering it 3897) as follows: "A deed given by the tax collector upon a sale made as in this section provided shall convey title to the purchaser free and clear of all liens, taxes, assessments or encumbrances of any kind or character whatsoever levied or assessed or liened on the property which are due at the time of such sale so conveyed prior to the date of such sale. . . ." In 1935 this identical language was put into subdivision 7 of section 3897 and it continued to so read until it was transferred, in 1939, to the new Revenue and Taxation Code (see §§ 3691-3730 thereof), so when the tax deeds involved herein were made by the state on February 4, 1938, the statute read as last quoted above.

A drastic change, then, had been made in the statute after the first "parity" cases had laid down the rule already discussed. If this change in legislation had not been made, we of course would be bound to follow the Neary case, *supra*, the facts of which are quite similar to the facts of the case at bar. In 1931, 1933 and 1935 the Legislature made material changes in, and additions to, section 3897, Political Code, and kindred sections following. That the 1933 changes were made for the purpose of changing the rule of the "parity" cases there can be no doubt. In the case of *Brewer* v. *Feigenbaum*, 47 Cal. App. (2d) 171, 173 [117 P. (2d) 737], this is said with respect to these statutory changes:

"It appears unnecessary to set forth in this opinion the lengthy provisions of said section 3897 of the Political Code as they existed on September 1, 1938. (See Deering's 1937 Political Code, section 3897.) That section had been amended following the decision in *La Mesa etc. Irr. Dist.* v. *Hornbeck*, 216 Cal. 730 [17 P. (2d) 143], and other related sections had been amended or added to the Political Code, including section 3897d. The last mentioned section was before the court in *South San Joaquin Irr. Dist.* v. *Neumiller*, 2 Cal. (2d) 485 [42 P. (2d) 64], and the court said on page 490: 'The legis-

lation was doubtless deemed expedient following our decision in *La Mesa Irrigation District* v. *Hornbeck*, 216 Cal. 730 [17 P. (2d) 143], wherein it was held that the liens for county taxes and for irrigation district assessments were of equal rank and the legislature found it necessary to provide some expeditious way to return to private ownership, and consequently to local tax rolls, lands covered by overlapping tax deeds. That the necessity existed is apparent for the reason that sales of tax titles would be complicated when purchasers could not be assured of a title free from liens possessed by other governmental agencies.'

"Nor is a detailed discussion of the provisions of said section 3897 required as there is no dispute concerning the construction to be placed upon any of said provisions and, as above indicated, it is conceded that the tax sale in question was conducted in all respects in accordance with said provisions. Suffice it to state that said section provides the procedure for the sale of real property which has been deeded to the state for delinquent taxes; provides for notice of the sale to other political subdivisions and taxing agencies having the right to levy taxes and assessments on the property; provides for certain rights which are granted to such political subdivisions and taxing agencies with respect to such sale, including the right to file claims for the amount of delinquent taxes and assessments and to share proportionately in the proceeds of such sale; and provides that the title conveyed to the purchaser is a title '. . . free and clear of all liens, taxes, assessments or encumbrances of any kind or character whatsoever levied or assessed or liened on the property which are due at the time of such sale. . . .' (Subd. 7.)"

The holdings in the "parity" cases showed that an impassé existed, to remove which new legislation was needed. The Neumiller case, cited in *Brewer* v. *Feigenbaum, supra*, elaborates upon the effect of this legislation and shows what it was designed to accomplish. For the purposes of the instant case it is sufficient to point out, by way of repetition, that because of these amendments, culminating in subdivision 7 of section 3897, Political Code, the effect of the deed *from* the state on February 4, 1938, was to "convey title to the purchaser free and clear of all liens, taxes, assessments or encumbrances of any kind or character whatsoever levied or assessed or liened on the property . . ." In the early case of *Dougherty* v. *Henarie,* 47 Cal. 9, 10 (where the controversy

was between a street assessment lienor and the holder of a tax deed), the court, with respect to similar language in a similar statute, said (p. 15): "More explicit and comprehensive language could not well have been employed to define the nature of the title which passes by the tax deed. . . . This language is so explicit as to require no interpretation and to leave no room for construction. The tax deed conveyed the title, discharged of the plaintiff's lien." In that case the court also said (p. 14): "The necessity of collecting revenue for the support of the Government imperatively requires that the lien for taxes shall take precedence over all other liens; and that a tax sale, followed by a proper conveyance, shall transfer the title discharged of prior tax liens. If the rule were otherwise, purchasers at tax sales would be deterred from bidding, and a large portion of the revenue would remain uncollected."

The respondent does not question the power of the Legislature to declare that tax liens shall be paramount, for in her brief she quotes the following from 37 Cyc. 1143: "It is competent for the legislature to make taxes a paramount lien on the property of the taxpayer, and this has been done in many states, the consequence being that a lien for taxes takes precedence of every other lien or claim upon the property of whatsoever kind, however created, and whether attaching before or after the assessment of taxes. But this preference does not belong to the tax lien unless it is so declared by statute, and a law, for example, which merely enacts that taxes shall be a lien on real property does not make them a first lien." There are a number of California cases so holding, notably *California Loan & Trust Co.* v. *Weis,* 118 Cal. 489, 492 [50 Pac. 697]. The cases of *Guinn* v. *McReynolds,* 177 Cal. 230 [170 Pac. 421], and *Home Owners' Loan Corporation* v. *Hansen,* 38 Cal. App. (2d) 748 [102 P. (2d) 417], emphasize the point "that even a tax lien is not entitled to rank ahead of a pre-existing mortgage or other contract lien, unless the legislative enactment creating the tax lien has given it priority."

Our conclusion is that the provisions of section 3897, Political Code, as they read when the appellants' tax deeds were issued, and as they read in 1935 when the deed was made *to* the state, operated to extinguish the lien of the street improvement bonds. The Neumiller and Brewer cases make it clear that the legislative intent was to do away with the

"parity" rule, and the language of section 3897 is clear and definite.

The Brewer case, *supra,* is authority for this holding, for there the court held that the tax deed, because of the language of section 3897, extinguished the lien of the city of Albany's taxes. It cannot be claimed, we believe, that the lien of the respondent's street improvement bonds are of any greater dignity than the lien for city taxes in that case.

In view of our holding that the statutory language is controlling it is unnecessary for us to discuss the case of *Woodill & Hulse Elec. Co.* v. *Young, supra,* also relied upon by appellants, which lays down the rule that the lien *last* in time is prior in right.

At the time the general taxes became delinquent Realty Syndicate Company was the owner of the four lots. It failed to pay the taxes and the usual procedure was followed. Respondent's predecessors in interest, being street assessment bond lienors, could have made redemption just as effectively as the record owner. This right could have been exercised at any time prior to the sale *by* the state on January 27, 1938. Respondent's concession that if judgment is entered herein in her favor it should be subject to taxes, is a concession that such redemption should have been made by her or her predecessors. This holding works no injustice upon respondent, because there existed from 1929 to January 27, 1938, a period of almost nine years, a right to redeem, which was not exercised. When respondent acquired "title" through the commissioner's deed on January 2, 1938, she knew, or should have known, that her "title" was subject to being defeated by a deed from the state unless she redeemed.

There is a second point which requires discussion. The respondent contended in the trial court that the assessment was void because of "The complete inadequacy of the descriptions in the assessments" which followed throughout all subsequent proceedings for the enforcement of the tax. This position was seriously contested below, and evidence, both oral and documentary, was addressed to this issue. The trial court held in favor of the appellants, having denied respondent's motion for a nonsuit on appellants' cross-complaint on this ground (while granting it on the other ground, first discussed). The respondent now seriously urges that the nonsuit should have been granted, and the judgment should now be affirmed, on *this* ground.

The assessment on the 1929-1930 rolls was against Berke-

ley Country Club Terrace No. 1, Lots 48a, 48b, 52a, 52b—nothing more. In other words there was no reference to any map on file or of record in any office.

In her complaint in this suit the respondent alleges that she is the owner in fee, and entitled to the possession, of Lots 48, 52, 53-A and 53-B as delineated and designated upon a map of Berkeley Country Club Terrace, Unit No. 1, filed September 18, 1922, in Map Book 18, pages 402-406, in the office of the recorder of Contra Costa County. The allegation continues: "Being also described as Lots 48-A, 48-B, 52-A, 52-B, 53-B, 53-C, and 53-D," as delineated and designated upon an *amended* official map of Units *1 and 2* of the same Terrace filed March 3, *1930,* in volume 1 of Official Maps, pages 25-31, in the same office.

When the 1929-1930 assessment was levied the 1922 map was on record, but the assessment not only made no reference to it but it described the lots otherwise than they were described therein. On the other hand, the 1930 recorded map describes the lots as they were assessed but it was not filed for some months after the assessment in question. Thus the assessment *on its face* finds no support in either map.

For the purpose of this discussion it may be assumed that the cases cited by respondent hold that an assessment such as this is prima facie invalid. But other cases cited by respondent hold that, despite this prima facie invalidity, "if it can be shown that there is only one map of a tract which includes the lot in controversy, upon which this lot is delineated or designated, and that that map is well known and generally accepted as authentic, it may be received in evidence as tending to identify the land before the court." (*Best* v. *Wohlford,* 144 Cal. 733, 737 [78 Pac. 293].) Respondent frankly concedes this rule, but claims that "There was no competent proof offered that the owner of the property in 1929 furnished the description upon which the tax assessment of 1929 was made."

The court found "That, in the making of said assessment, the assessor of said Contra Costa County, described each separate parcel of said real property, by reference to a certain unrecorded map, wherein each said parcel was shown, exactly as described in said assessment, thereof, and which said map was mailed to and furnished to said assessor by the owner of said lands and was accompanied by the written request of said owner, to said assessor that the said assessment of said

lands, for the tax year 1929-30, be made in accordance with said map and as the several parcels of said lands were shown thereon. That said map was not in existence at the time of the trial of this action.'' The written request was contained in a letter dated January 9, 1929, signed Realty Syndicate Company by H. W. Watson, reading as follows: ''We are resubdividing some of the lots in Berkeley Country Club Terrace, which we still own. Maps have been drawn up for filing in the county recorder's office, but there is a probability that they will not be filed before the first Monday of March of this year. Therefore, we are enclosing maps of the resubdivision and request that you make separate assessments against the lots as they are not [now] cut up.'' The original letter was produced from the assessor's files and its receipt, on or about its date, was testified to by the assessor and his chief deputy, both of whom testified that it was accompanied by a map. The witness Watson, who wrote the letter and sent the map had charge, at the time, of all matters of assessment, and the supplying of data or information for affidavits for assessment purposes, and testified that his best recollection was that he enclosed, ''in the envelope enclosing said letter, a certain map of a resubdivision of said real property, the exact details and descriptions contained in which said map he did not remember, but believed identical with 'Amended Official Map of Units 1 and 2, Berkeley Country Club Terrace,' except that this map of 1930, Plaintiff's Exhibit 6, had a designation and name, whereas he could not be positive by what, if any, name the map mailed to the Assessor was designated; that he assumed and believed the map mailed by him to said Assessor, showed the lots subdivided and numbered as shown and numbered in the assessment proceedings of said Assessor for the year 1929, and as appearing on said Assessor's 'block' or 'work' book, in said Assessor's Office, and in accordance with the request contained in his letter.'' The assessor testified that accompanying the letter ''was a map, showing the subdivision of the lots, the subject matter of the instant action, as he had assessed them in the year 1929'' which map had since been lost or mislaid. He testified, further, that in addition to the assessment roll, ''there was maintained for assessment purposes, in his office, a book, commonly referred to as the office 'work book,' in which there were exact copies of all and any filed and official maps of assessable real property in the County of Contra Costa, which said maps were prepared,

for his office, by the County Surveyor. That said assessment 'work book' prior to receipt of said letter from the said witness Watson, contained an exact copy of the said 'Map of Berkeley Country Club Terrace Unit No. 1,' filed in 1922 . . . that is to say, that, as shown upon said map and said assessment 'work book,' there was no subdivision whatever of Lots 48 and 52, into the smaller parcels, referred to as Lots 48a and 48b, 52a and 52b, 'Map of Berkeley Country Club Terrace, Unit No. 1,' but that, upon receipt of the said letter from the witness, Watson, he caused some one in his office to subdivide said Lots 48 and 52, as shown upon 'Map of Berkeley Country Club Terrace, Unit No. 1,' into said smaller parcels and designated them, upon said assessment 'work book,' as Lots 48a, 48b, 52a and 52b, etc., as said smaller lots or parcels were shown and designated upon the said lost or mislaid map, by him received, and as enclosed with the said letter from the said witness, Watson.'' The chief deputy county assessor testified that he had diligently searched for the map but without success; that he recalled the receipt by the assessor of the letter accompanied by a map showing the resubdividing of Unit No. 1 into smaller subdivisions, and that the ink lines upon the assessor's ''work assessment book'' subdividing the lots ''and numbering and designating said smaller parcels, had been made exactly in accordance with and exactly as shown upon the said map'' enclosed with the letter. There was the testimony of another witness for the appellants, a civil engineer who had surveyed these lots and made both maps in question. His testimony was not inconsistent with that of the other three witnesses. He did testify that he did not know what map was referred to by the witness Watson, and did not remember having seen such map,— that it must have been some map the employees of the corporation ''got together by maps furnished the company by him.'' This testimony, at most, is only negative; it was not contradictory of appellants' other three witnesses. C. P. Murdock, the vice-president and general manager of the company was called as a witness by the respondent, and his affidavit made on the first Monday of March, *1930,* the year after the assessment here in question, was introduced in evidence, apparently to show that the lots then, in *1930,* were not declared as subdivided, but rather in accordance with the old 1922 map. This, of course, was no contradiction of the appellants' witnesses, for it was addressed to a different assessment, a year

242

later. Even if it had concerned the 1929 assessment, there is sufficient testimony in the record to support the finding of what actually happened. From all this testimony, which we have referred to at some length, it will be seen that the finding is amply supported by competent evidence. The finding, in brief, comes to this: that the assessor acted upon a description (however informal) furnished by the owner with the request that separate assessments be made against the lots "as they are now cut up." That, and just that, was done.

In the first place, "The law does not require the recordation of a map before it can be used in tax proceedings." (*Morton* v. *Sloan*, 96 Cal. App. 747, 751 [275 Pac. 223]; *Schainman* v. *All Persons*, 96 Cal. App. 753, 758 [275 Pac. 225, 276 Pac. 113]. But over and above that, it is definitely settled in this state that "A taxpayer may not complain of a description taken from a statement of property furnished by him, or by someone on his behalf and by his authority. . . . It is presumed in support of an assessment that a description is identical with that contained in the statement furnished by the owner." (24 Cal. Jur. 192, § 178.) See *Lake County* v. *Sulphur, etc. Mining Co.*, 68 Cal. 14, 16 [8 Pac. 593] (citing *San Francisco* v. *Flood*, 64 Cal. 504 [2 Pac. 264].) In *San Francisco* v. *Pennie*, 93 Cal. 465 [29 Pac. 66], where the Flood case is followed, it is said: "The object of requiring any description of the property is, that the tax-payer may know for what property he is assessed; and whatever is sufficient to identify that property with reasonable certainty is a sufficient compliance with the statute." And, further, (p. 471): "For the purpose of determining whether this description was sufficient to identify the property, and to give sufficient information to the tax-payer of the property for which he was assessed, the court was at liberty to examine the surroundings connected with the assessment." The Pennie case is followed in *Dear* v. *Weineke*, 94 Cal. 322 [29 Pac. 646]. In *Lummer* v. *Unruh*, 25 Cal. App. 97, 104 [142 Pac. 914], the following is quoted from Cooley on Taxation: "The designation of the land will be sufficient if it affords the owner a means of identification and does not positively mislead him, or is not calculated to mislead him." The Flood case, the Pennie case and *Best* v. *Wohlford*, *supra*, are cited to the same effect. In the very recent case of *Biaggi* v. *Phillips*, 50 Cal. App. (2d) 92, 98 [122 P. (2d) 619], the same passage is repeated. And in *E. E. McCalla Co.* v. *Sleeper*,

105 Cal. App. 562, 567 [288 Pac. 146], this is said: "While it is true that the map to which reference is made in the present case was not prepared in the manner provided by section 3658a of the Political Code, it was provided by the plaintiff itself and contained the only description of the property which was furnished to the officer. The owner was therefore estopped from challenging the sufficiency of the description which it had given to the assessor. (*Dear* v. *Varnum*, 80 Cal. 86 [22 Pac. 76]; *Jacoby* v. *Wolff*, 198 Cal. 667, 674 [247 Pac. 195]; 24 Cal. Jur. 192, § 178.)"

The respondent who, on the foreclosure of the street assessment bonds, succeeded to whatever title the owner had, stands in the owner's shoes and cannot, under the cases cited, attack the description—so found, on uncontradicted evidence to have been supplied by the owner—any more than the owner could have attacked it. The owner would have no difficulty in identifying its own land from its own description. Moreover, the complaint shows that the lots as subdivided *and as assessed* were the same lots as shown by the 1922 map.

A stipulation in the record shows that Lot 53-B was removed from the case. The findings and judgment therefore affect only Lots 48, 52 and 53-A, otherwise described (and assessed) as Lots 48-A, 48-B, 52-A and 52-B.

It should be noted that the case of *Brewer* v. *Feigenbaum*, *supra*, was not decided until October, 1941, long after this case was tried, and after the briefs on this appeal had been filed.

The judgment is reversed with directions to the trial court to enter a judgment and decree quieting the title of appellants to their respective lots.

Peters, P. J., and Ward, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied October 29, 1942. Carter, J., and Traynor, J., voted for a hearing.